UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80180-Civ-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

Plaintiff,

vs.

NATIONWIDE CONNECTIONS, INC.,
*et. al.*,

Defendants.

_____/

### Defendant The Billing Resource d/b/a Integretel's
### Emergency Motion for Stay Pending Appeal
### and Incorporated Memorandum in Support Thereof

Defendant The Billing Resource d/b/a Integretel ("Integretel") moves pursuant to Fed. R.

Civ. P. 62(c), on an emergency basis, that the Court stay (1) the provisions of the Court's

Omnibus Order entered Sept. 14, 2007 (D.E. 610) determining that the amounts shown on

Integretel's books as the IGT Reserve for Access One and Network One constitute Receivership

property and ordering Integretel to pay the reserve amounts to the Receiver ("the Payment

Order") and ordering Integretel to show cause why it should not be held in contempt ("the Show

Cause Order") and (2) its Order Granting Motion for Clarification as to Scope of Stay entered

Sept. 21, 2007 ("the Clarification Order") (D.E. 619) pending the resolution of the appeal of

those orders that Integretel has taken to the Eleventh Circuit. In the alternative, Integretel moves

that these orders be stayed for a period of five days to allow Integretel to move for a stay from

the Eleventh Circuit and that upon the filing of such a motion the stay be continued in effect until

that motion is acted on.

### The Need for Emergency Relief

Emergency treatment is necessary because enforcing the Payment Order would most

likely force Integretel out of business and because ongoing litigation over the reserve issues here

and in the bankruptcy court will itself interfere with Integretel's ability to reorganize. We

recognize that the Court denied the Receiver's recent emergency motion on the ground that "the

Bankruptcy Court should have the opportunity to make its own determination as to Integretel's [cash-collateral] motion."[1] However, Integretel believes that it is appropriate to present this motion on an emergency basis so that it is fully briefed and ripe to be decided quickly in case the bankruptcy court's decision does not fully meet Integretel's need for immediate relief.

## Background

The Payment Order directed Integretel to pay the Receiver the amount of the reserves as of the date of the TRO: "Integretel shall provide a sworn statement identifying the amount of reserves as of the issuance of the TRO. The Court further orders that these funds shall be placed in a segregated Receivership account."[2] The undisputed record evidence is that when the TRO was issued, the Integretel's books showed the amount of the IGT reserves for Access One and Network One—*i.e.*, the amount that Integretel was ordered to pay—to be $1,230,479.89.[3]

As we have previously told the Court, Integretel does not maintain reserve amounts in a separate account. Moreover, Integretel routinely has less cash on hand than would be required to cover the reserve amounts for its clients. Paying the reserve amounts for Access One and Network One to the Receiver would deplete Integretel's operating cash so drastically that Integretel would in all likelihood be forced out of business.[4] Rather than close down—thereby injuring numerous customers and vendors and putting its employees out of work—Integretel filed for bankruptcy protection under Chapter 11 in the Northern District of California (where it is based) on Sunday, September 16—*i.e.*, before the first business day after the Omnibus Order was entered.[5] This action should not have been a surprise to the Receiver or the FTC, for they

---

1. Order Denying Receiver's Emergency Motion in Furtherance of the Pending Contempt Proceeding at 2 (D.E. 625). After that order was entered, Integretel moved in the bankruptcy court for a TRO under § 105 of the Bankruptcy Code, 11 U.S.C. § 105, temporarily barring future litigation in this action. That motion, which was being prepared when the Court denied the Receiver's emergency motion, has been set for a hearing on Wednesday, September 26.

2. Omnibus Order at 10 (D.E. 610).

3. Decl. of Ken Dawson in Opp. to Receiver's Show Cause Mtn. ("Dawson Show-Cause Decl.") ¶ 21 (D.E. 296-2).

4. Decl. of Ken Dawson from bankruptcy proceedings, submitted herewith as Ex. 1 ("Dawson Bankr Decl.").

5. *In re The Billing Resource*, No. 07-bk-52890 (Bankr. N.D. Cal.).

had both known for at more than nine months that Integretel would have to go into bankruptcy if it were ordered to pay the Receiver the amount of the reserves.[6]

On Wednesday, September 19—the third business day after filing for bankruptcy—Integretel commenced an adversary proceeding in the bankruptcy court seeking a declaration as to the applicability of the automatic stay to this action and further seeking an injunction under 11 U.S.C. § 105 barring the further litigation of the FTC's claims.[7]

Later that day, the Receiver effectively acknowledged that the Payment Order was covered by the automatic stay and submitted the issue of whether the stay should remain in effect to the bankruptcy court. In his opposition to Integretel's bankruptcy motions seeking permission to use cash collateral and to continue using its existing bank accounts, the Receiver argued, "The Federal Receiver believes that the appropriate remedy is relief from the automatic stay in order to effectuate the orders of the District Court with respect to the Receiverships, which motion the Receiver intends to file forthwith, should the Court not *sua sponte* order such relief."[8]

On the morning of Thursday, September 20, the FTC informed the Court's chambers of its intent to file its emergency motion and faxed a copy of the motion to chambers.[9] The FTC's motion failed to disclose the fact that the Receiver had already acknowledged that the Payment Order was subject to the automatic stay.

At 11:33 a.m. on September 20—an hour and a half after the FTC had informed chambers of its emergency motion and faxed chambers a copy of the motion, the Court's ECF notification system sent an email reciting the following action by the Court: "Endorsed ORDER striking [579] Motion. Proceedings against The Billing Resource d/b/a Integretel are stayed due to the entity's recent bankruptcy filing. Integretel may refile its motion, if necessary."[10] And at 1:16 p.m. that day, the Court entered an order formally declaring that the case had been automatically stayed by Integretel's bankruptcy:

---

6. Decl. of Michael Ahrens from bankruptcy proceedings, submitted herewith as Ex. 2 ("Ahrens Bankr. Decl.").

7. *The Billing Resource v. Chase*, No. 07-ap-05156 (Bankr. N.D. Cal. filed Sept. 19, 2007).

8. Ex. 3 hereto at 9-10.

9. *See* Ex. 4 hereto.

10. D.E.616.

> [T]he instant action against The Billing Resource, d/b/a Integretel, is subject to the automatic stay set forth in 11 U.S.C. § 362. The automatic stay granted by 11 U.S.C. § 362(a) will remain in effect until the bankruptcy case is dismissed or closed, or until such earlier times as set forth in 11 U.S.C. § 362(c), (d), (e) or (f).[11]

Based on the fact that chambers had been told about the motion, and had apparently received a copy of it, almost three and a hours before this order was entered, Integretel and its counsel reasonably believed that the Court had been aware of the FTC's motion when it issued this order and had taken it into consideration. As a result, Integretel reasonably concluded that the case was stayed and that there was no need for it to respond to the FTC's emergency motion (at least not on an urgent basis). Indeed, undersigned counsel were not even sure whether in light of the stay they were permitted to respond.

Counsel were therefore dumbfounded when they learned that at 4:11 p.m., the Court had—without waiting for a response from Integretel, without giving Integretel a deadline for responding, and without giving Integretel any warning that it was about to act inconsistently with the two stay orders it had issued the day before—granted the FTC's motion, vacated the prior day's orders, and held that the automatic stay did not apply. There was no genuine emergency justifying this action. The only circumstances that the FTC had identified in its motion as constituting an emergency was the fact that a hearing in the bankruptcy court was scheduled for the next day.[12] That hardly constitutes an emergency, since the FTC could (and did) participate in the hearing.

Integretel has now appealed both the Court's September 21 Clarification Order and its September 14 Omnibus Order to the Eleventh Circuit, and it respectfully asks that the Court stay its rulings pending the outcome of that appeal.

## Argument

In order to obtain a stay pending appeal, the movant must ordinarily satisfy one of two alternative standards:

- Under the first standard, the movant must show (1) that it is likely to succeed on the merits on appeal, (2) that without a stay it will be irreparably injured, (3) that a stay

---

11. D.E. 617.

12. FTC Emergency Motion at 11 (D.E. 618).

will not substantially harm the opposing party, and (4) that a stay would serve the public interest.[13]

- Under the second standard, the movant must show (1) that it has a substantial case on the merits and (2) that the balance of the equities as determined by the other three factors weighs heavily in the movant's favor.

However, where, as in this case, the order being appealed from is a decision that the automatic stay does not apply, factors relating to the balance of the equities should assume much less importance in relation to the issue of likelihood of success on the merits. That is so because Congress has, by enacting the automatic stay, already balanced the equities. As the Eleventh Circuit has explained, "The metes and bounds of the automatic stay are provided by statute and systematically applied to all cases."[14] If the automatic stay applies to the creditor's conduct, it applies regardless of any other equities. In that event, consideration of equities becomes appropriate only at the stage of considering whether the stay should be lifted or modified—an decision that may be made only by the bankruptcy court.

**A. Integretel is likely to succeed on its appeal, and in any event it has a substantial case on the merits.**

We discuss the two orders in reverse chronological order, since we did not have a chance to present argument in opposition

**1. *The September 21 clarification order is procedurally improper and substantively erroneous.***

The Eleventh Circuit is likely to reverse the Court's September 21 clarification order regarding the automatic stay for several reasons.

*First*, the Court was mistaken in its conclusion that the automatic stay applies "only to protect property of the bankruptcy estate or property of the debtor."[15] Under 11 U.S.C. § 362(a)(3), which the Court did not cite, the stay extends to "any act to obtain possession of property of the estate *or of property from the estate*[.]"[16] Under this provision, a debtor is entitled

---

13. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986); *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. June 26, 1981) (binding in the Eleventh Circuit under *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)).

14. *Jove Engineering, Inc. v. IRS*, 92 F.3d 1539, 1546 (11th Cir. 1996).

15. Clarification Order at 4 (D.E. 619).

16. 11 U.S.C. § 362(a)(3) (emphasis added).

to the benefit of the stay to protect property that is merely in his possession, regardless of whether he has a legal or equitable interest in it.[17] Thus, even though the Court has held (erroneously, we believe) that the funds belong to the Receivership estate, the Payment Order is nevertheless stayed because it is an act to obtain possession of property *from* Integretel's estate.

*Second*, the question whether the automatic stay applies to the Payment Order was not properly before the Court. The Receiver had already acknowledged that the stay applied and had sought relief from the stay from the only court authorized to grant such relief—the bankruptcy court.[18] The FTC did not have standing to seek a ruling about the application of the stay to the Payment Order. The order had been issued based on a motion by the Receiver, not by the FTC. And more fundamentally, the right to bring suit to recover property alleged to belong to the Receivership estate is vested solely in the Receiver. It was inappropriate for the FTC to second-guess the Receiver's judgment about how best to proceed in light of Integretel's bankruptcy.

*Third*, the Court was mistaken in saying that the Omnibus Order directed Integretel "to pay the current reserve funds, amounting to $1,762,762.56."[19] As discussed above, the Omnibus Order directed Integretel to pay the amount of the reserves as of the issuance of the TRO—*i.e.*, as of Feb. 27, 2006. That amount was more than half a million dollars lower than the figure cited by the Court.

*Fourth*, the Court was mistaken in holding that the civil contempt proceedings are covered by the "regulatory exception" under 11 U.S.C. § 362(b)(4). And to the extent that the Court ruled that the regulatory exception applies to the Payment Order, that conclusion was erroneous as well. The regulatory exception applies only to actions or proceedings "by a governmental unit to enforce such governmental unit's police and regulatory power[.]" The only motion before the Court seeking payment of the reserve amounts was the one filed by the Receiver, who is not a "governmental unit." Even if the Receiver could somehow be deemed a

---

17. *In re Atlantic Business and Community Corp.*, 901 F.2d 325, 328 (3d Cir. 1990) ("The language of Section 362 makes clear that mere possession of property at the time of filing is sufficient to invoke the protections of the automatic stay."); *Turbowind, Inc. v. Post Street Management, Inc. (In re Turbowind, Inc.)*, 42 B.R. 579, 585 (Bankr. S.D. Cal.1984) ("The operation of the automatic stay does not depend on the debtor having either a legal or equitable interest in the property, but applies to property merely in the debtor's possession at the time of filing").

18. Ex. 3 hereto at 9-10.

19. Clarification Order at 1 (D.E. 619).

governmental unit, the regulatory exception still does not apply, because it extends only to proceedings by a governmental unit "to enforce *such governmental unit's* police and regulatory power[.]"[20] The Receiver has no police or regulatory to enforce; his function is the purely pecuniary one of collecting, managing, and distributing the Receivership defendants' assets. This is the case even though the Receiver was appointed in an action brought by the FTC, because the Receiver cannot assert the FTC's rights or interests and because the Payment Order was not based on any finding that Integretel has violated the FTC Act. Furthermore, the Court has said that the Payment Order is based on its *in rem* jurisdiction over Receivership assets, and that jurisdiction derives, not from any regulatory power granted by the FTC Act, but from the Court's general equitable powers. Finally, even if the regulatory exception otherwise applied here, it would not permit enforcement of the Payment Order. Section 362(b)(4) expressly provides (and the FTC admits) that a governmental unit may not enforce a money judgment against a debtor. The Payment Order constitutes such a judgment.

*Fifth*, civil contempt proceedings whose purpose is merely to enforce a payment obligation that would otherwise be subject to the automatic stay are not exempted from the automatic stay. Because the Payment Order is subject to the automatic stay, contempt proceedings to enforce it are stayed as well.[21]

*Finally*, the order was issued in violation of Integretel's procedural rights under the due-process clause, this Court's local rules, and basic conceptions of fairness. The Court issued its ruling without waiting to hear from Integretel or even setting a deadline for Integretel to file a response. Moreover, the Court's stay orders of September 20 induced Integretel to believe that the FTC's motion was moot and that it was unnecessary to respond to it.

## 2. The September 14 Omnibus Order is mistaken for numerous reasons.

The rejection of our arguments in the Omnibus Order was mistaken. We will focus here on the some of the most significant areas in which we believe the Court has erred.

*First*, and most important, the Court was mistaken in its conclusion that the reserves constitute Receivership property. Perhaps the most fundamental principle of the law of creditors'

---

20. 11 U.S.C. § 362(b)(4) (emphasis added).

21. *See, e.g., SEC v. Brennan*, 230 F.3d 65 (2d Cir. 2000) (automatic stay was violated by order in regulatory proceeding requiring repatriation of trust assets and setting contempt hearing to compel compliance).

rights is that a general unsecured creditor has no legal or equitable interest in any of the debtor's assets unless and until he reduces his claim to judgment and obtains a judgment lien or otherwise levies on the debtor's property.[22] As discussed below, there is no basis for concluding that Access One and Network One had any enforceable property interest in the reserve amounts before the Receiver was appointed—even if those amounts were, as the Court suggests "owed" under the contracts. And since they had no such property interest before the Receiver was appointed, the receivership order could not magically confer on the Receiver a property interest that had not previously been in existence.

One of the bases for the Court's erroneous conclusion was its characterization of the IGT Reserves as funds "held on behalf of, or for the benefit of, a Defendant."[23] The Court points to nothing in the contracts that supports that conclusion, and no such provision exists. On the contrary, the contracts expressly state that the purpose of the IGT Reserve is "to protect IGT[.]"[24]

The conclusion that the Reserve is not held on behalf of, or for the benefit of, Access One and Network One is also supported by other provisions of the contracts. Under the contract with Access One, the client expressly transferred its interest in the billing transactions to Integretel, so it could not have retained any interest in the proceeds of those transactions.[25] And both contracts expressly disclaimed any intent to create the sort of relationship whereby Integretel would be holding funds "on behalf of, or for the benefit of" the clients. Specifically, they provided that

---

22. See, e.g., Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, 527 U.S. 308, 330 (1999); Pussey & Jones Co. v. Hanssen, 261 U.S. 491, 497 (1923); Adler v. Fenton, 65 U.S. 407, 410–13 (1860); 381651 Alberta, Ltd. v. 279298 Alberta, Ltd., 675 So.2d 1385, 1387–88 (Fla. App. 1996) (citing Adler, supra).

23. Omnibus Order at 3 (D.E. 610).

24. Dawson Show- Cause Decl. Ex. 1 at 5 (Exhibit A), 10 (Schedule II, § 5.b) & Ex. 2 at 11 (Exhibit A), 19 (Schedule II, § 5.b) (D.E. 296-2).

25. Dawson Show-Cause Decl. Ex. 1 at 11 (Sched. II, § 10) (D.E. 296-2):

> Client acknowledges that the Billing Contracts with Telcos are structured as a purchase of accounts receivable, with recourse, in order for the Telco to be empowered to bill and collect the underlying charge amounts from End-Users. Therefore, Client agrees, and does hereby transfer to [Integretel] any rights in the Billing Transactions that may be necessary for [Integretel] to fulfill its obligations hereunder in compliance with the Billing Contracts with Telcos.

Integretel is not the client's "agent, partner, joint venturer, trustee, fiduciary, or legal representative[.]"[26]

Although the Court is correct in stating that "[a]n entity need not be an agent, partner, joint venturer, trustee, fiduciary, or legal representative to possess funds that one is holding 'on behalf of' another person or entity,"[27] the decision is silent as to what other type of relationship the Court thinks existed between Integretel and its clients and as to the legal basis for finding that the relationship existed. There is, in short, no reason whatever for thinking that the Receiver (or Access One and Network One before him) had any legal or equitable interest in any of Integretel's assets.

Another basis for the Court's mistaken conclusion was its statement that the Receiver's claim "is not a claim at law governed by pre-receivership contracts, . . . but one governed by this Court's jurisdiction over receivership property based on the TRO and Amended Preliminary Injunction."[28] Neither the TRO nor the Amended Preliminary Injunction says a word about whether the IGT Reserve amounts are Receivership property. Although the Amended Preliminary Injunction does require anyone in possession of Receivership property to turn it over to the Receiver,[29] it does not purport to determine which specific assets belong to the Receivership estate.

To decide whether the Receiver has an interest in a given piece of property, therefore, one must look outside the injunction's four corners. But neither the Court nor the Receiver nor the FTC has pointed to anything other than the contracts that can serve that purpose. (On the contrary, the FTC acknowledged that "determining the ownership of the [reserves] . . . involves interpreting the contracts[.]"[30])

The Omnibus Opinion suggests that the Receiver's property interest somehow derives from the Court's power to grant equitable remedies. But no matter how broad that power might be, it does not go so far as to empower the Court to create legal rights and obligations without

---

26. Dawson Show-Cause Decl. Ex. 1 at 4, § 19(k) & Ex. 2 at 9, § 19(k) (D.E. 296-2).

27. Omnibus Order at 3 (D.E. 610).

28. Omnibus Order at 4 (D.E. 610).

29. The TRO imposed such an obligation only on the Nationwide defendants. (TRO § X.A.1 (D.E. 19).)

30. D.E. 399 at 21.

basing them on some other source such as a contract, a statute or regulation, or a common-law principle.

Nor is the Court's decision supported by the statement that the reserve amounts are within the Court's *in rem* jurisdiction. That conclusion puts the cart before the horse. Whether a particular asset is subject to the Court's *in rem* jurisdiction depends on whether the Receivership estate has a legal or equitable interest in it. The Court therefore may not start with the assumption that *in rem* jurisdiction applies and then rely on that assumption to justify a finding that the asset belongs to the Receiver.

And in any event, the Court was mistaken in the conclusion that it has *in rem* jurisdiction over the reserve amounts, as well as in its underlying premise that *in rem* jurisdiction extends to disputed assets held by third parties.[31] *In rem* jurisdiction attaches only to assets within the Court's actual or constructive possession.[32] And a long line of cases establishes that the Court has no such possession over assets that are in the hands of a third party who holds them under a substantial claim of right, as Integretel does here.[33] Even if the one case the Court relies on—a district court decision—could somehow be controlling in the face of contrary precedent from the Supreme Court and several appeals courts, the fact is that the case is irrelevant to the point for which it is cited, for in that case the receiver's ownership interest in the funds at issue was not in dispute.[34]

*Second*, the Court was mistaken in concluding that the Receiver is not bound by the contracts' ADR/arbitration provisions.[35] That conclusion was based in part on the premise that the Receiver's rights were not contractual, but were derived entirely from the Court's orders. The discussion immediately above has shown that premise to be unfounded.

---

31. Omnibus Order at 5, 7 (D.E. 610).

32. *See, e.g.*, *Penn General Casualty Co. v. Commonwealth of Pennsylvania ex rel. Schnader*, 294 U.S. 189, 195 (1935); *L'Invincible*, 14 U.S. 238, 246-47 (1816); *The Brig Ann*, 13 U.S. 289, 291 (1815); *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 964 (4th Cir. 1999).

33. *E.g.*, *Taubel-Scott-Kitzmiller Co. v. Fox*, 264 U.S. 426, 432-34 (1924); *In re Reading Co.*, 711 F.2d 509, 515-16 (3d Cir. 1983); *In re Kansas City Journal-Post Co.*, 144 F.2d 812, 813 (8th Cir. 1944); *Wheaton v. Daily Telegraph Co.*, 124 F. 61, 62 (2d Cir. 1903).

34. *FTC v. Productive Marketing, Inc.*, 136 F. Supp. 2d 1096 (C.D. Cal. 2001); *see* D.E. 399 at 16 n.6; D.E. 394 at 9 n.8.

35. The discussion here also applies to the contracts' choice-of-venue provisions, which the Court does not discuss.

The conclusion that the ADR/arbitration clause did not bind the Receiver was also based on the statement that the Receiver is not bound by contracts he has not affirmatively adopted.[36] But that Receiver did affirmatively adopt the contracts here; he did so by seeking to enforce claims that arose, if at all, only under the contracts. By attempting to obtain benefits under the contracts, the Receiver implicitly ratified and adopted them.[37]

It is well established that receivers are bound by arbitration clauses included in the receivership entity's contracts.[38] That being the case, any contract-related issues must be resolved by arbitration.

*Third*, having erroneously undertaken to interpret the contracts, the Court's interpretation was also mistaken. In the Court's view, "Integretel had agreements in place with Access One/Network One that permitted [it] to withhold monies that were 'owed to' . . . Access One/Network One as 'reserves,' in the event that any users complained about charges and requested refunds and/or credits directly from [Integretel]."[39] This is wrong on several counts. To begin, with the contracts did not define the IGT Reserve as an amount withheld from amounts "that were 'owed to'" the clients; rather, it defined them as amounts withheld from "the amount *otherwise* owed to Client[.]"[40] Thus, amounts allocated to the IGT Reserves do not become owed to the client unless and until Integretel releases them. As the contracts state, "Client shall be entitled to all collected amounts, up to and including the gross value of the Billing Transactions remitted to the Telcos, *less any amount due and owing to [Integretel] hereunder, including, without limitation, . . . IGT Reserves . . . .*"[41] Moreover, the decisions whether to allocate funds to

---

36. Omnibus Order at 5 (D.E. 610).

37. *See, e.g., Clews v. Jamieson*, 182 U.S. 461, 483 (1901); *Gross v. Regnor Fin. Co.*, 96 F.2d 37, 38 (5th Cir. 1938); *URI Cogeneration Partners, L.P. v. Board of Gov. for Higher Educ.*, 915 F. Supp. 1267, 1280 (D.R.I. 1996); *Navrides v. Zurich Ins. Co.*, 488 P.2d 637, 704 (Cal. 1971).

38. *Javitch v. First Union Securities, Inc.*, 315 F.3d 619, 624-27 (6th Cir. 2003); *Capitol Life Ins. Co. v. Gallagher*, 839 F. Supp. 767, 769 (D. Colo. 1993); *ISP.COM LLC v. Theising*, 805 N.E.2d 767, 774–75 (Ind. 2004); *Theising v. ISP.COM LLC*, 805 N.E.2d 778, 780 (Ind. 2004).

39. Omnibus Order at 1-2 (D.E. 610).

40. Dawson Show-Cause Decl. Ex. 1 at 10 (Sched. II, § 5.b) & Ex. 2 at 19 (Sched. II, § 5.b) (D.E. 296-2) (emphasis added).

41. Dawson Show-Cause Decl. Ex. 1 at 10 (Sched. II, § 6) & Ex. 2 at 19 (Sched. II, § 6) (D.E. 296-2) (emphasis added).

the IGT Reserve and whether to release them are left to Integretel's reasonable discretion.[42] And the purpose of the IGT Reserve is not the narrow purpose suggested by the Court. Rather, the IGT Reserve was defined more broadly as "an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover reserves or offsets, other than Uncollectibles imposed by a Telco."[43]

The Court was similarly mistaken in its conclusion that Integretel is not entitled to keep the reserve amounts because the contracts do not include liquidated damages provisions and supposedly do not "give it the right to make an independent, unilateral decision about Access One's or Network One's breach of the agreements without court involvement."[44] That conclusion ignores the fact funds that Integretel allocates to the IGT Reserve are *by definition* not owed to the client. Thus, it makes no sense to say that the lack of a liquidated damages provision somehow prevents Integretel from continuing to hold funds that it does not owe to its client. Nor does it make sense to suggest that Integretel must obtain a court's permission to retain reserve funds when the contract expressly commits the decision whether to adjust the IGT Reserve requirement for a particular account to Integretel's reasonable discretion.[45]

The Court was also incorrect in stating that Integretel has no right of indemnification because it is being sued for its own alleged wrongdoing. The violations of the FTC Act that Integretel is charged with committing resulted from its submission to LECs of the fraudulent charges generated by Access One and Network One, so that if Integretel violated the law, its violations were entirely derivative of Access One's and Network One's. And the Court previously held in its decision granting the aggregator defendants leave to plead cross-claims and third-party claims that they *are* allowed to seek indemnification from third parties for any liability they may incur beyond the disgorgement of profits.[46]

*Fourth*, the Court was mistaken in its conclusion that a preliminary injunction issued without prior notice and opportunity for a hearing is valid as long as the person sought to be

---

42. Dawson Show-Cause Decl. Ex. 1 at 10 (Sched. II, § 5.b) & Ex. 2 at 19 (Sched. II, § 5.b) (D.E. 296-2).

43. Dawson Show-Cause Decl. Ex. 1 at 5 (Exhibit A), 10 (Schedule II, § 5.b) & Ex. 2 at 11 (Exhibit A) 19 (Schedule II, § 5.b) (D.E. 296-2).

44. Omnibus Order at 4 (D.E. 610).

45. Dawson Show-Cause Decl. Ex. 1 at 10 (Sched. II, § 5.b) & Ex. 2 at 19 (Sched. II, § 5.b) (D.E. 296-2).

46. Order Granting Mtn. of Aggregator Defs.' for Lv. to Amend Answers at 2-4 (D.E. 536).

bound is subsequently given an adequate chance to defend against the charges.[47] That conclusion flies in the face of Fed. R. Civ. P. 65(a)(1), which provides, "No preliminary injunction shall be issued without notice to the adverse party." It also flies in the face of Supreme Court case law on preliminary injunctions[48] and on due process.[49] Neither of the two cases cited by the Court on this point is apposite.

*Fifth*, the Court is mistaken in its conclusion that an injunction can be binding on a nonparty based solely on the fact that the nonparty allegedly acted in concert with a named defendant at some time before the injunction was issued.[50] The concerted-action requirement is satisfied only when the nonparty participates with an enjoined party in violating the injunction, which of course can only occur after the injunction is issued.[51] It was therefore an error for the Court to find that Integretel could be bound as a nonparty based on its having provided services to Access One and Network One long before the TRO was issued.[52]

*   *   *

The discussion above lists only some of the ways in which we believe the Court's ruling is mistaken. But even that partial list is sufficient to show that Integretel is likely to succeed on appeal and that in any event the issues it intends to raise are very substantial indeed.

**B.    The balance of equities weighs heavily in Integretel's favor.**

*1.    Integretel will be irreparably injured if the Court's payment order is not stayed.*

Although a purely economic loss does not usually amount to irreparable injury, it does if it is so serious that it would significantly disrupt the defendant's business, cause the defendant to suffer a significant loss of revenue and customer goodwill, or force the defendant into bankruptcy.[53] The mere threat that the Court's payment order will be enforced has already forced

---

47.  Omnibus Order at 6, 8 (D.E. 610).

48.  *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 438-39 (1974).

49.  *E.g., Fuentes v. Shevin*, 407 U.S. 67, 82 (1972); *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971).

50.  Omnibus Order at 7 (D.E. 610).

51.  *See, e.g., G & C Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 35 (1st Cir. 1980).

52.  Omnibus Order at 7 (D.E. 610).

53.  *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) (bankruptcy); *BellSouth Telecommunications Inc. v. MCI Metro Access Transmission Services, LLC*, 425 F.3d 964, 970 (11th Cir. 2005)

Integretel into bankruptcy. Actually enforcing the order would in all likelihood make it impossible for Integretel to remain in business or to successfully reorganize and would therefore force it into liquidation.[54] For a corporation, injury does not get any more irreparable than that.

The harm to Integretel from having to participate in further contempt proceedings—by which we mean having to litigate the contempt issues—would obviously be less severe, but it would nevertheless be real. The proceedings would force Integretel to continue incurring litigation costs that would diminish the resources available for a reorganization. They would similarly continue to distract Integretel's management from the business of reorganizing the company. Although harms such as these would not ordinarily be regarded as irreparable injuries, they take on a different complexion when the alleged contemnor is in bankruptcy. And of course any contempt sanctions that might be imposed for the purpose of compelling compliance with the Payment Order would cause the same irreparable harm as the Payment Order itself.

### 2.    A stay would not substantially harm the Receiver.

The only effect that staying the payment order would have on the Receiver would be to prevent him from receiving the money he seeks to recover from Integretel unless and until the Court's order is affirmed on appeal. In theory, the Receiver would face the possibility of two types of harms: the loss of use of the money during the appeal and the risk that Integretel's financial condition would deteriorate and that it would be unable to pay the money. The loss of use of the money would be fully compensable by awarding interest on the amount Integretel has been ordered to pay. And granting a stay would actually eliminate what is currently the biggest threat to Integretel's financial condition—the efforts of the Receiver and the FTC to enforce the Court's order.

Moreover, any marginal risk that the Receiver might incur as a result of a stay would have to be discounted when one recalls the Court's repeated statements that consumers are unlikely to ever see any significant recovery in this case because the individual amounts at issue are so small. That means that while the stakes for Integretel are a matter of its very survival, what

---

(loss of customers and goodwill); *Delta Air Lines, Inc. v. Airline Pilots Ass'n, International*, 238 F.3d 1300, 1308 n.18 (11th Cir. 2001); *Nermer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993) (major disruption of business; threat to continued existence of business).

54. Ex. 1 hereto.

is at stake on the other side is little more than the amount that will ultimately be paid to the Receiver, to his lawyers, and to the United States Treasury.

Nor would the Receiver be significantly harmed if the contempt proceedings are stayed. If the payment order is stayed, going forward with the contempt proceedings would serve no purpose: coercive sanctions would be unavailable, because they would be inconsistent with the stay of the payment order. And any compensatory award would be unenforceable against Integretel except as a prepetition claim to be submitted in the bankruptcy.

### 3.   A stay would serve the public interest.

Staying the payment order would serve the public interest because Integretel would not be the only entity harmed by enforcing that order. If the order is enforced Integretel put out of business, Integretel's creditors would be harmed, because they would in all likelihood recover less on their prepetition claims than they would recover through a successful reorganization. And Integretel's employees would lose their jobs and their livelihoods.

Moreover, if Integretel was forced to go out of business, competition in the billing-aggregation industry would be significantly reduced. There are currently only three full-service billing aggregators, and without Integretel there would be only two. It would be ironic (to say the least) if an order enforcing an injunction obtained by the FTC resulted in diminishing competition.

Finally, the public interest would not be harmed by a stay of the contempt proceedings. This is so for much the same reason that civil contempt sanctions are subject to the automatic stay in the first place: the purpose of civil contempt is not to vindicate the court's power, but to provide the opposing party an effective remedy. Furthermore, the Receiver is hardly in a position to invoke the public interest in enforcing the FTC Act, for his role in this litigation is to assert what would, if he had not been appointed, be claims belonging to entities that were among the primary wrongdoers. And beyond that, there has been no finding that Integretel violated the law. Integretel stands before the Court as a defendant against which accusations have been made but not proved. In those circumstances, the contempt proceedings against Integretel do not implicate any significant public interest.

## Conclusion

For the foregoing reasons, the Court should grant Integretel's motion. It should stay (a) the Sept. 21 Clarification Order, (2) the Payment Order, and (3) the contempt proceedings pending the completion of Integretel's appeal.

Alternatively it should enter a temporary stay in order to permit Integretel to request a stay from the court of appeals. Denying even such limited stay to permit Integretel to seek provisional relief from the Eleventh Circuit would "not [be] consistent with the fair, effective administration of justice[.]"[55]

Dated: September 25, 2007.

Respectfully submitted,

/s/ Neal Goldfarb
Richard H. Gordin, Pro hac vice
Neal Goldfarb, Pro hac vice
TIGHE PATTON ARMSTRONG TEASDALE PLLC
1747 Pennsylvania Ave., N.W., Suite 300
Washington, D.C. 20006
rgordin@tighepatton.com
ngoldfarb@tighepatton.com
Tel.:   (202) 454-2800
Fax:   (202) 454-2805

Scott B. Newman, Florida Bar No. 339717
Martin J. Alexander, Florida Bar. No. 346845
HOLLAND & KNIGHT LLP
222 Lakeview Ave., Suite 1000
West Palm Beach, Florida 33401
scott.newman@hklaw.com
marty.alexander@hklaw.com
Tel.:   (561) 833-2000
Fax:   (561) 650-8399

*Counsel for The Billing Resource d/b/a Integretel*

### Statement Pursuant to Local Rule 7.1.A.3

I HEREBY CERTIFY that counsel for Integretel attempted in good faith to resolve this matter without the need for filing this motion, but was unable to do so. Counsel for the FTC has stated that the FTC does not consent to any of the relief sought here. Counsel for the Receiver has not responded to undersigned counsel's email and voicemail message asking whether the Receiver would consent to a stay.

Scott B. Newman

---

55. *FTC v. Weyerhauser Co.*, 665 F.2d 1072, 1076 (D.C. Cir. 1981). *See also* Mem. of Pts. & Auths. in Support of Pltff's Mtn. for Inj. Pending Appeal at 6, *FTC v. Whole Foods Market, Inc.*, No. 07-cv-01021-PLF (D.D.C. filed Aug. 17, 2007) (available at <http://www.ftc.gov/os/caselist/0710114/0710114injpendpub.pdf> (accessed Sept. 24, 2007)).

**Certificate of Service**

I HEREBY CERTIFY that on September 25, 2007, I filed the foregoing document with the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

Scott B. Newman

**SERVICE LIST**
**Federal Trade Commission vs. Nationwide Connection, Inc., et al**
**Case No. 06-80180-Civ-Ryskamp/Vitunac**

**CM/ECF Notice List:**

LAURA M. KIM, ESQ.
lkim@ftc.gov and ereid@ftc.gov
MICHAEL J. DAVIS, ESQ.
mdavis@ftc.gov
COLLOT GUERARD, ESQ.
cguerard@ftc.gov and cguerard@comcast.net
RICHARD McKEWEN, ESQ.
rmckewen@ftc.gov
ROBERT SCHOSHINSKI, ESQ.
rschoshinski@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave., N.W., Room 286
Washington, DC  20580
202-326-3734 telephone (Kim)
202-326-3395 facsimile
*Attorneys for Plaintiff Federal Trade*
*Commission*

MARK D. JOHNSON, ESQ.
MarkDJohnsonPA@bellsouth.net
Mark D. Johnson, P.A.
10 Central Parkway, Suite 210
Stuart, Florida  34994
772-223-7700 telephone
772-223-1177 facsimile
*Attorneys for Defendants, Yaret Garcia, Erika*
*Riaboukha and Qaadir Kaid*

MICHAEL GARRETT AUSTIN, ESQ.
maustin@mwe.com
305-347-6517 telephone
STEVEN E. SIFF, ESQ.
ssiff@mwe.com
305-347-6511 telephone
McDermott Will & Emery LLP
201 S Biscayne Boulevard
Suite 2200
Miami, FL 33131-4336
347-6500 facsimile
*Attorneys for Defendants Billing Concepts, Inc.,*
*ACI Billing Services, Inc. d/b/a OAN, and BSG*
*Clearing Solutions North America, LLC*

ANDREW G. BERG, ESQ.
ABerg@kslaw.com
CAROLYN TAPIE, ESQ.
ctapie@kslaw.com
KEVIN DINAN, ESQ.
KDinan@kslaw.com
JOHN-DAVID THOMAS, ESQ.
jthomas@kslaw.com
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-4704
202-737-0500 telephone
202-626-3737 facsimile
*Attorneys for Defendants Billing Concepts,*
*Inc., ACI Billing Services, Inc. d/b/a OAN, and*
*BSG Clearing Solutions North America, LLC*

ROSANNE BRADY, ESQ.
Rosanne@macalusolaw.com
PETER N. MACALUSO, ESQ.
peter@macalusolaw.com
The Law Office of Peter N. Macaluso
3302 N  Tampa Street
Tampa, FL 33603
813-251-2831 telephone
813-228-7004 facsimile
*Attorneys for Crossclaim defendant/Third-party*
*defendant Ronny Morrillo*

DERICK J. RODGERS, ESQ.
drodgers@lawdcm.com
Davis Cedillo & Mendoza Inc
McCombs Plaza, Suite 500
755 E. Mulberry Avenue
San Antonio, TX  78212
210-822-6666 telephone
210-822-1151 facsimile
*Attorneys for Defendants Billing Concepts, Inc.,*
*ACI Billing Services, Inc. d/b/a OAN, and BSG*
*Clearing Solutions North America, LLC*

DIANE NOLLER WELLS, ESQ.
dwells@devinegoodman.com
Devine Goodman Pallet & Wells, PA
777 Brickell Avenue, Suite 850
Miami, FL  33131
305-374-8200 telephone
305-374-8208 facsimile
*Attorneys for Second Churchill Way,LLC*

HENRY W. JOHNSON
hjohnson@jzwlawfirm.com
Hume & Johnson
1401 University Drive, Suite 301
Coral Springs, FL  33071
954-755-9880 telephone
*Attorneys for Interested Party John J. Smith*

JEFFREY C. SCHNEIDER, ESQ.
jcs@tewlaw.com
PATRICK J. RENGSTL
pjr@tewlaw.com
MICHELLE T. VISIEDO-HIDALGO, ESQ.
mtv@tewlaw.com
Tew Cardenas LLP
Four Seasons Tower—15th Floor
1441 Brickell Avenue
Miami, FL  33131
305-539-2481 telephone
305-536-1116 facsimile
*Attorneys for Receiver David R. Chase*

GARY M. DUNKEL, ESQ.
dunkelg@gtlaw.com
JASON H. OKLESHEN, ESQ.
okleshenj@gtlaw.com
Greenberg Traurig
Phillips Point – East Tower, Suite 300-E
777 South Flagler Drive
West Palm Beach, FL  33401
561-650-7900 telephone
561-655-6222 facsimile
*Attorneys for Interested Party BHD/Web, LLC*

MICHAEL WOODBURY, ESQ.
michael.woodbury@woodbury-santiago.com
Two Datran Center—Penthouse 1A
9130 South Dadeland Boulevard
Miami, FL  33156
305-669-9570 telephone
305-669-8616 facsimile
*Attorneys for Grunspan Trust, et al*

JOHN W. CHAPMAN, JR., ESQ.
jchapman@nhlslaw.com
Norton Hammersley Lopez & Skokos
1819 Main Street, Suite 610
Sarasota, FL  34236
941-954-4691 telephone
941-954-2128 facsimile
*Attorneys for ThirdParty Plaintiff Systems &*
*Services Technologies*

ROBERT M. WEINBERGER, ESQ.
rmw@fcohenlaw.com
Cohen Norris Scherer Weinberger & Wolmer
712 U.S. Highway 1, Suite 400
North Palm Beach, FL 33408
*Attorneys for Interested Party Denise McCann*

THOMAS G. LONG, ESQ.
tlong@barnettbolt.com
HILDEGUND P. WANDERS, ESQ.
Barnett Bolt Kirkwood & Long
601 Bayshore Boulevard, Suite 700
Tampa, FL 33606
813-253-2020 telephone
813-251-6711 facsimile
*Attorney for BMW Financial Services*

ROBERT VOSS FITZSIMMONS, ESQ.
rvf@kubickidraper.com
Kubicki Draper
City National Bank Building
25 W Flagler Street, Penthouse
Miami, FL 33130-1712
305-982-6741 telephone
305-374-7846 facsimile
*Attorneys for AmeriCredit Financial Services*

CHAD A. DEAN, ESQ.
chad@schuylaw.com
Schuyler Stewart Smith
118 West Adams Street, #800
Jacksonville, FL 32202
904-353-5884 telephone
904-353-5994 facsimile
*Attorneys for Primus Automotive Financial
Services and Ford Motor Co. Credit Co.*

BRUCE ERIC BLOCH, ESQ.
sblawfirm@aol.com
Sapurstein & Bloch PA
9700 South Dixie Highway, Suite 1000
Miami, FL 33156
305-670-9500 telephone
305-670-6900 facsimile
*Attorneys for J P Morgan Chase Bank, N.A.*

THEODORE J. LEOPOLD, ESQ.
tleopold@riccilaw.com
Ricci Leopold
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
561-684-6500 telephone
561-515-2610 facsimile
*Attorneys for Interested Party Mercantile Bank*

**Manual Notice List:  (via U.S. Mail)**

WILLOUGHBY FARR, Inmate No. 653974
Avon Park Correctional Institution
PO Box 1100
County Road 64 East
Avon Park, FL 33926-1100
*Defendant, Pro Se*

MARY LOU FARR
c/o James Stonehill
1006 Churchill Circle South
West Palm Beach, FL 33405
*Defendant, Pro Se*

MICHAEL DAVID McDONOUGH, ESQ.
12794 Forest Hill Blvd., Suite 19D
Wellington, FL 33414
561-791-0590 telphone
*Attorney for Crossclaim defendants/Third-party
defendants German Miranda and Jesus
Sandoval*

Jessy Mendoza
6117 Blue Grass Circle
Lake Worth, FL 33463

# Exhibit 1

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  STEVEN B. SACKS, Cal. Bar No. 98875
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4  ORI KATZ, Cal. Bar No. 209561
   Four Embarcadero Center, 17th Floor
5  San Francisco, California  94111-4106
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947

7  Proposed Attorneys for The Billing Resource, dba
   Integretel
8
                  UNITED STATES BANKRUPTCY COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                        [SAN JOSE DIVISION]
11

| 12 | In re | Case No. 07-52890 |
|----|-------|-------------------|
| 13 | THE BILLING RESOURCE, dba INTEGRETEL, a California corporation, | Chapter 11 |
| 14 | Debtor. | |
| 15 | Tax ID: 33-0289863 | |
| 16 | | |

| 17 | THE BILLING RESOURCE, dba INTEGRETEL, a California corporation, | Adv. Proc. No. 07-05156 |
|----|----|----|
| 18 | Plaintiff, | **DECLARATION OF KEN DAWSON IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| 19 | v. | |
| 20 | FEDERAL TRADE COMMISSION, and DAVID R. CHASE, not individually, but solely in his capacity as receiver for Nationwide Connections, Inc., Access One Communications, Inc., Network One Services, Inc., 411TXT, Inc., CELL-INFO-USA, INC., Enhanced Billing Services, Inc., Toll Free Connect, Inc., Cripple Creek Holdings, LLC, Built to Last, LLC, Not Fade Away, LLC, He's Gone, LLC, The Other One, LLC, Turn on Your Love Light, LLC, China Cat Sunflower, LLC, Lazy River Road Holdings, LLC, | Date:        September 26, 2007<br>Time:        2:15 p.m.<br>Place:       United States Bankruptcy Court<br>             280 South First Street<br>             San Jose, California<br>Judge:       Hon. Arthur S. Weissbrodt<br>Courtroom: 3020 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | Defendants. | |

27
28

I, Ken Dawson, declare as follows:

1.     I am the President and Secretary of The Billing Resource, dba Integretel, a California corporation (the "Debtor"), the named debtor in this case.  I make this declaration in that capacity.  I was one of the Debtor's founders in 1988 and I have been with the company ever since.  I have personal knowledge of the matters set forth below.  If called upon to testify as to those matter I could and would do so competently.

2.     This declaration is submitted in support of the Debtor's "Emergency Motion For Temporary Restraining Order And Order To Show Cause Re:  Preliminary Injunction And Declaratory Relief" (the "Motion").  Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

3.     The Debtor has filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is operating its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.     The Debtor was formed in 1988 based on a need for aggregators to facilitate billing and collections on behalf of smaller telecommunications companies that provided "alternative operator services" ("AOS") which otherwise could not afford to compete with the larger local exchange carriers ("LECs" or "Telcos") such as AT&T.

5.     AOS involves providing long-distance calling on an occasional or as-needed basis in situations where often the consumer uses the service provider's assets or services without the consumer or the service provider knowing each other's identity.  For example, a service provider owning the service contract for a hotel chain has no idea as to the identity of the consumer using its phones.  If an AOS provider facilitates a collect call it needs a way to bill the consumer for that call.

6.     The Debtor addressed a significant industry void by creating a service bureau focused entirely on billing-related services for AOS providers and others needing a means of billing consumers for their services.  As the cornerstone to its billing capability, the Debtor maintains a full complement of billing and collection agreements with an estimated 1,400 or more LECs and independent service providers so that it can place calls made

1  through an AOS on a LEC bill.  This infrastructure enables telecommunication service
2  providers to incorporate their charges within the phone bills of more than 90% of business
3  and residential consumers throughout the United States and Canada.

4       7.  The Debtor quickly established itself as a leader in providing LEC billing
5  solutions for diverse and emerging products and services.  The Debtor presently offers a
6  complete array of complementary services including internet-delivered management and
7  settlement reporting, direct billing, customer care and collection support.  As a strategic
8  back-room business partner, the Debtor frees its clients to focus their efforts on promoting
9  and selling products and services.

10       8.  The Debtor has served thousands of service providers over the years.  The
11  vast majority of the processed billings have been in support of smaller sized businesses
12  that otherwise would not have been able to compete.  It is the competitive pressure of these
13  smaller companies that has forced down the rates charged to consumers by the larger
14  telecommunication companies.

15       9.  The Debtor has approximately thirty-seven employees.  Twenty-two of those
16  employees have been with the company for over five years, and thirteen have been with
17  the Debtor for over ten years.  In addition, the Debtor's services support, through
18  outsourced relationships, approximately 20-30 call center personnel in several different
19  call centers who are employed by a third-party vendor.

20       10.  Access One Communications, Inc. ("Access One") and Network One
21  Services, Inc. ("Network One") were two of the Debtor's prior AOS customers (Access
22  One and Network One are collectively referred to as the "Prior Customers").

23       11.  On February 27, 2006, the Federal Trade Commission (the "FTC")
24  commenced a lawsuit (i.e., the Florida Action) against three AOS providers, including the
25  Prior Customers, as well as their principals, alleging deceptive and unfair practices for
26  unauthorized billing of charges on phone bills – referred to as "cramming" – in violation of
27  the Federal Trade Commission Act (the "FTCA"). The Florida Action is captioned <u>Federal</u>
28  <u>Trade Commission v. Nationwide Connections, Inc., et al.</u>, Case No. 06-80180-Civ-

-2-

DECLARATION OF KEN DAWSON RE EMERGENCY
MOTION FOR TRO

1  Ryskamp, United States District Court for the Southern District of Florida. The Florida
2  Court entered a temporary restraining order and later a preliminary injunction. The Florida
3  Court appointed the Receiver as the receiver for the defendants and certain of their
4  affiliates. An "Amended Preliminary Injunction Order" was filed on September 25, 2006.
5  On or about September 21, 2006, the FTC filed an amended complaint which included
6  claims against the Debtor and another billing aggregator.

7       12.   The FTC alleged in its Amended Complaint that the Debtor caused certain of
8  the Prior Customers' fraudulent charges to be placed on end users' phone bills and that the
9  Debtor was liable under the FTCA in spite of the fact that the LECs, not the Debtor,
10  perform the billing.

11       13.   The FTC has sought injunctive relief against the Debtor as well as monetary
12  redress including restitution for the allegedly defrauded consumers. There has been no
13  finding that the Debtor violated the FTCA.

14       14.   The Debtor voluntarily stopped providing services for the Prior Customers
15  over a year prior to the FTC's filing of its Amended Complaint. At the time that it stopped
16  providing services, the Debtor stopped making payments to the Prior Customers and
17  instead made a determination under the contracts with the Prior Customers that all further
18  amounts received from LECs on account of their billings should be booked as reserves.
19  This was done because of the Debtor's possible exposure to claims for refunds of the Prior
20  Customers' Billing Transactions.

21       15.   Whenever the Debtor allocated an amount to the reserves for the Prior
22  Customers, the Debtor made a bookkeeping entry for that amount. However, the Debtor
23  does not have a corresponding asset, such as a bank account, that contains the monies that
24  were allocated as reserves from the Prior Customers. Moreover, there is no segregated
25  account containing the reserves of any customer, including either of the Prior Customers.
26  The Debtor does not have enough monies to cover the full amount of reserves for all of the
27  Debtor's customers.

28       16.   In contrast to the FTC's allegations, the Debtor asserted that the Prior

-3-

DECLARATION OF KEN DAWSON RE EMERGENCY
MOTION FOR TRO

1 | Customers' wrongful conduct caused great injury to the Debtor, including by causing the

2 | Debtor to incur fees and expenses to defend the FTC action.

3 |      17.    The Receiver is seeking to collect all assets of the Prior Customers. Toward

4 | that end, the Receiver sought relief in the Florida Action by motion against the Debtor.

5 | The Receiver asserted that the Debtor owes the Prior Customers the amount that the

6 | Debtor booked as reserves for the Prior Customers, which the Receiver alleged was an

7 | asset of the Prior Customers, in an amount in excess of $1.7 million. The Receiver further

8 | alleged that the Debtor had violated the Amended Preliminary Injunction Order and should

9 | be held in contempt for failing to turn over the sums demanded by the Receiver.

10 |      18.    The Debtor filed a response opposing such relief on numerous grounds,

11 | including that at the most, any rights the Prior Customers—and therefore the Receiver,

12 | who stood in their shoes—had with respect to the reserves were simply those rights of a

13 | general, unsecured creditor. The Debtor also asserted that it had offsetting claims under

14 | the Subject Contracts against the Prior Customers which exceeded the amount of the Prior

15 | Customers' alleged reserves. In particular, to the extent the Debtor has any liability in the

16 | Florida Action, it arises from the misconduct of the Prior Customers, not the Debtor, and

17 | pursuant to the Subject Contracts, the Prior Customers are liable to the Debtor for such

18 | liability, as well as the costs and fees incurred in the Florida Action. These costs and fees,

19 | and the liability asserted against the Debtor in the Florida Action, far exceed the amount of

20 | any sums withheld from the Prior Customers as reserves.

21 |      19.    The Debtor has expended over $700,000 in legal fees and costs to date in

22 | defending the Florida Action. That case is set for trial in February 2008.

23 |      20.    The Debtor has also had to devote substantial and valuable management and

24 | employee time and resources to the Florida Action. Given the schedule in that case, the

25 | Debtor's management will need to be diverted even more is issue and would be forced to

26 | further incur such items, to the detriment of its reorganization efforts, if this action were

27 | not stayed as against the Debtor.

28 |      21.    The Debtor believes that it will ultimately prevail in the Florida Action, and

-4-

DECLARATION OF KEN DAWSON RE EMERGENCY
MOTION FOR TRO

1  that it will ultimately be held to owe nothing to the Receiver.  However, the Debtor could
2  not pay the money sought by the Receiver and still continue its normal operations.  The
3  Debtor requested that the Receiver agree to a stay to the implementation and enforcement
4  of the Payment Order.  The Receiver refused.  The Debtor thereafter filed for bankruptcy
5  protection.

6      22.    The Debtor filed for bankruptcy protection because it could not continue its
7  operations and pay over $1.7 million to the Receiver.  Nor can it afford to have the Florida
8  Action continue at the outset of this case, when it will divert its management's attention
9  from the reorganization effort and cost very significant attorneys' fees and costs that the
10  Debtor cannot afford.  The Debtor can only proceed with a successful reorganization if the
11  Florida Action, including the Payment Order, is stayed.

12      23.    The Debtor has submitted a budget to this Court in connection with the
13  Debtor's cash collateral motion.  The budget shows that the Debtor had $1.9 million in
14  cash at the filing date and expects receivables to be paid in the next three weeks of $3.9
15  million.  If that cash is not used to meet secured creditors' claims on it and to make
16  payments to the Debtor's current customers in exchange for continuing to submit
17  receivables to the Debtor, then they may, as soon as they are able to do so, stop doing
18  business with the Debtor and bring its operations to a halt.  The Chapter 11 filing has
19  unsettled the Debtor's customer relationships.  For the Debtor to reorganize it needs to
20  retain these customers. It cannot do so if its scarce resources are used for past claims
21  asserted by the Receiver and in connection with litigation with the FTC.

22      24.    Moreover, if the Prior Customers' claims are paid now, they would receive
23  far more than their pro rata share of any funds available to return reserves to customers.
24  The Debtor's current customers have no different entitlement to the Debtor's assets than the
25  Receiver.  If the other customers are not afforded similar relief, then the Prior Customers
26  will have been preferred to the detriment of the Debtor's other creditors.

27      25.    Obviously, the FTC claims it is acting in the public interest by proceeding
28  with its claims against the Debtor for its involvement with the Prior Customers some two

DECLARATION OF KEN DAWSON RE EMERGENCY
MOTION FOR TRO

years ago. But the FTC cannot achieve any proper regulatory goal if continuing the Florida Action merely puts the Debtor out of business, reducing competition in the marketplace from three firms to two. The Debtor plays an important role in helping keep telecommunication prices down, thereby serving the public interest. Unless the Florida Action is stayed, the Debtor is likely to cease operations. A forced liquidation of the Debtor will forfeit the Debtor's going concern value, leaving the Debtor's creditors much worse off. A cessation of the business will also cost the Debtor's employees their livelihoods. This will leave no regulatory purpose to the Florida Action.

26.     Putting the Debtor out of business would also prejudice the Debtor's existing customers. Unlike the two Prior Customers who are no longer operating, the Debtor's other customers are still in business and likely would not be able to switch all of their billing and collection needs over from the Debtor to one of the Debtor's competitors fast enough to avoid substantial harm to their business operations.

27.     The Debtor believes it will be able to successfully confirm a plan of reorganization. It bases that belief on the fact that on a going forward basis, the Debtor can be cash flow positive if it maintains its existing level of revenue and does not incur extraordinary costs arising from previous operations. The Debtor has a number of avenues open to it to reorganize. It could propose a plan under which it establishes a pot from which unsecured claims would be paid *pro rata*. It could also propose to issue new common stock in exchange for the unsecured debt, thus making its creditors into shareholders, with a stake in outcome of future operations. It could conclude a sale of its business to a competitor or other buyer and the proceeds of that sale would comprise the distributions that unsecured creditors would receive, after payment of secured claims and administrative costs.

28.     Given sufficient time the Debtor can formulate a plan and negotiate that plan with its creditors. The Debtor faces no insuperable obstacles to successfully resolving this bankruptcy case.

I declare under penalty of perjury under the laws of the United States of America that the

W02-WEST:5SS1\400439177.1

DECLARATION OF KEN DAWSON RE EMERGENCY
MOTION FOR TRO

1  foregoing is true and correct.

2  September 24, 2007

3

4

5                                                    /s/ Ken Dawson

6                                                   KEN DAWSON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:5SS1\400439177.1

DECLARATION OF KEN DAWSON RE EMERGENCY
MOTION FOR TRO

# Exhibit 2

1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
    MICHAEL H. AHRENS, Cal. Bar No. 44766
3   TERRENCE V. PONSFORD, Cal. Bar No. 42648
    JEFFREY K. REHFELD, Cal. Bar No. 188128
4   ORI KATZ, Cal. Bar No. 209561
    Four Embarcadero Center, 17th Floor
5   San Francisco, California  94111-4106
    Telephone:      415-434-9100
6   Facsimile:      415-434-3947
    Email:          mahrens@sheppardmullin.com
7                   jrehfeld@sheppardmullin.com
                    okatz@sheppardmullin.com
8
    Proposed Attorneys for The Billing Resource,
9   dba Integretel

10
                    UNITED STATES BANKRUPTCY COURT
11
                    NORTHERN DISTRICT OF CALIFORNIA
12
                            SAN JOSE DIVISION
13

14
    In re                              │ Case No. 07-52890 ASW
15                                      │
    THE BILLING RESOURCE, dba           │ Chapter 11
16  INTEGRETEL, a California corporation, │
                                        │ **DECLARATION OF MICHAEL H.**
17              Debtor.                  │ **AHRENS IN SUPPORT OF DEBTOR'S**
                                        │ **REPLY TO OPPOSITIONS TO (1)**
18  Tax ID: 33-0289863                  │ **EMERGENCY CASH COLLATERAL**
                                        │ **MOTION; (2) EMERGENCY CASH**
19                                      │ **MANAGEMENT MOTION; AND (3) EX**
                                        │ **PARTE APPLICATION FOR**
20                                      │ **APPOINTMENT OF KEN DAWSON AS**
                                        │ **DEBTOR'S RESPONSIBLE INDIVIDUAL**
21                                      │ **AND IN SUPPORT OF DEBTOR'S**
                                        │ **MOTIONS**
22                                      │
                                        │
23                                      │ **Date:      Friday, September 21, 2007**
                                        │ **Time:      1:30 p.m.**
24                                      │ Place:      United States Bankruptcy Court
                                        │             280 South First Street
25                                      │             San Jose, California
                                        │ Judge:      Hon. Arthur S. Weissbrodt
26                                      │ Courtroom:  3020

27

28

W02-WEST:FJR:400436995.5                                    DECLARATION

1     I, Michael H. Ahrens, declare as follows:

2     1.    I am an attorney licensed to practice law in the State of California and am admitted

3 before this Court. I am a partner with the law firm of Sheppard, Mullin, Richter & Hampton LLP

4 ("Sheppard Mullin"), proposed bankruptcy reorganization and general insolvency counsel for The

5 Billing Resource, dba Integretel, a California corporation (the "Debtor"), the debtor in the above-

6 captioned chapter 11 bankruptcy case (the "Bankruptcy Case"). I make this declaration in that

7 capacity. Except for those statements made upon information and belief, the following facts are

8 based upon my personal knowledge and if called to testify, I could and would competently testify

9 to such facts. As to those statements made upon information and belief, I believe them to be true.

10     2.    I have been a practicing attorney for thirty-seven years. My practice has almost

11 exclusively been concentrated on bankruptcy law. I am a member of the American College of

12 Bankruptcy Lawyers.

13     3.    I have appeared in bankruptcy cases numerous parts of the country. I am admitted

14 to practice and have argued bankruptcy matters before the United States Supreme Court. I have

15 represented many companies in financial difficulty, and have represented as counsel for the debtor

16 in possession numerous companies who for bankruptcy protection under chapter 11 of title 11 of

17 the United States Code (i.e., the "Bankruptcy Code"). Among the chapter 11 bankruptcy cases in

18 which I have acted as the lead counsel for the debtor in possession in the Bankruptcy Court for the

19 Northern District of California are Dillingham Construction, Natural Wonders, Vista Properties,

20 iSyndicate, and Media Vision. I have also represented debtors in possession in many other

21 bankruptcy courts.

22     4.    This declaration is submitted in support of the Debtor's Reply (the "Reply") to the

23 Oppositions to (1) the Emergency Cash Collateral Motion; (2) Emergency Cash Management

24 Motion; and (3) Ex Parte Application for Appointment of Ken Dawson as Debtor's Responsible

25 Individual (the "Oppositions"), including without limitation the opposition filed by David R

26 Chase, not individually, but solely as the receiver for certain entities (the "Receiver"), appointed

27 by the United States District Court for the Southern District of Florida in the lawsuit captioned

28 Federal Trade Commission v. Nationwide Connections, Inc., et al., Case No. 06-80180-Civ-

1  Ryskamp (the "Florida Action") and the Opposition filed by Public Communications Services, Inc.
2  to the Debtor's Cash Collateral.

3      5.      Two of the entities for which the Receiver was appointed the Receiver were
4  Access One Communications, Inc. ("Access One") and Network One Services, Inc. ("Network
5  One"), which were two of the Debtor's prior AOS provider customers (Access One and Network
6  One collectively shall be referred to as the "Prior Customers").

7      6.      I was asked to give insolvency advice to the Debtor in October of 2006. At that
8  time the Debtor was a defendant in the Florida Action. Motions were pending at that time in that
9  case that I reviewed. I understood at that time that if the motions were granted an order might be
10  forthcoming in the Florida Action that would require the Debtor's payment of moneys in excess of
11  $1 million. I looked at financial information of the Debtor at the time, and it became apparent to
12  me that the Debtor was insolvent. If the Debtor was ordered to pay in excess of $1 million it was
13  obvious to me that such a payment would be a preference payment to one creditor while the
14  Debtor was in the zone of insolvency.

15      7.      After I was engaged as insolvency counsel by the Debtor, the Debtor's litigation
16  counsel in the Florida Action contacted the FTC and the Receiver in the Florida Action and
17  informed them that the Debtor wanted to inform the FTC and the Receiver about the realities that
18  the Debtor could not respond to a money judgment and could not pay a preference to one creditor
19  over another. That counsel requested that the FTC and the Receiver meet with me so that I could
20  discuss with them the financial situation of the Debtor and the Debtor's possible bankruptcy. That
21  counsel for the Debtor's in the Florida Action began efforts to set up a meeting between the FTC's
22  counsel, the Receiver's counsel, and me as the Debtor's bankruptcy counsel.

23      8.      I flew to Washington, D.C., and along with the Debtor's litigation counsel in the
24  Florida Action, met with the FTC at the FTC's offices in Washington, D.C. on November 21,
25  2006. A business representative of the Debtor was also present at this meeting. The Receiver's
26  counsel, Mr. Jeff Schneider, was present for the entire meeting by telephone.

27      9.      At that November 21, 2006 meeting, I informed the FTC and the Receiver's counsel
28  that I had been hired as the Debtor's bankruptcy lawyer. I told them that we had done a liquidation

W02-WEST:FJR\400436995.5

-2-

DECLARATION

1   analysis and determined that on a liquidation creditors would receive less than 100% on the dollar.

2   I said that if an order came down requiring a payment to the Receiver of Network One and Access

3   One, our client would have to file bankruptcy. I discussed with them the fact that our client was in

4   the "zone of insolvency" and my client could not allow one creditor to receive a preference over

5   another. I stated then that there were many other clients that had claims just like Network One and

6   Access One, and the Debtor could not allow one creditor to be paid in preference to another while

7   in the zone of insolvency. The FTC had an in-house bankruptcy lawyer at this meeting in

8   November 2006, and also had a bankruptcy lawyer at a follow-up meeting that I had with the FTC

9   in April of 2007. The FTC lawyers indicated then that they understood these positions, and

10  understood the developing case law about not paying preferences while in the "zone of

11  insolvency."

12          10.     For the full portion of the November 21, 2006 meeting the lawyer for the Receiver

13  of Access One and Network One was on the telephone line. That lawyer for the Receiver was Jeff

14  Schneider. He participated in that meeting, and I also informed him during the meeting that the

15  Debtor would have to file bankruptcy if a judgment for monetary relief was rendered against the

16  Debtor.

17          11.     Prior to the November 21, 2006 meeting, the Debtor's counsel had provided the

18  FTC's counsel with the financial statements of the Debtor. During the November 21, 2006

19  meeting, the FTC's counsel as well as a FTC accountant who attended the meeting asked questions

20  of me and the Debtor's senior financial representative who attended the meeting with me. We

21  responded with answers to those questions. For the few questions we could not answer at that

22  moment, we followed up and provided the FTC with additional information after the meeting.

23          12.     During the November 21, 2006 meeting Laura Kim, one of the FTC's attorneys,

24  stated that she would like to see a liquidation analysis. We did not have one to give her for that

25  meeting, but I emailed her one on December 18, 2006. The liquidation analysis was used to

26  demonstrate to the FTC and to the Receiver that even if a payment order was entered in the Florida

27  Action requiring a payment of the alleged reserves to Access One and Network One, there was not

28  enough money to pay all creditors and that the Debtor would have to file for bankruptcy

-3-

1    protection. I told them also at the November 21, 2006 meeting the type of plan the Debtor might

2    file in a bankruptcy case. I indicated that we might file a stock for debt plan to allow the company

3    to reorganize for the benefit of all creditors. I said that if any one creditor seized money the

4    Debtor's operations could not continue and the Debtor's reorganization would not be possible.

5        13.    The Debtor does intend to file a plan to preserve the business and reorganize. The

6    filing of the bankruptcy should not have been a surprise to the Receiver or the FTC, as I personally

7    had met and/or talked to them about the Debtor's plan and need to file bankruptcy if an order was

8    rendered requiring my client to pay substantial moneys to the Receiver. After the November 21,

9    2006 meeting I spoke by telephone may times to FTC representatives about bankruptcy questions

10   and questions about the financial status of the Debtor and its affiliates. I or one of my other

11   partners, also sent numerous emails to the FTC enclosing approximately 15 or more documents

12   the FTC representatives had requested about the Debtor and its financial condition.

13       14.    I also had a further follow-up meeting with the FTC's lawyers at the FTC's

14   headquarters in Washington, D.C. on April 18, 2007. At that meeting I again impressed upon the

15   FTC's counsel that that the Debtor was in the "zone of insolvency," could not allow one creditor to

16   receive a preference over another while in the zone of insolvency, and that if an order came down

17   requiring a payment to the Receiver of Network One and Access One, my `Debtor client would

18   have to file bankruptcy. The Receiver's counsel was not present at this April, 2007 meeting.

19   However, based upon statements made to me by the FTC's counsel, I understood that the FTC's

20   were in contact with the Receiver's counsel and would be communicating to him the statements

21   made and what had occurred at the meeting.

22       15.    The Debtor filed its voluntary petition under chapter 11 of title 11 of the United

23   States Code (i.e., the "Bankruptcy Code") on Sunday, September 16, 2007. Within hours of the

24   Debtor's filing of its bankruptcy petition, on Monday, September 17, 2007 at 7:25 a.m. Eastern

25   Time, the Debtor's counsel in the Florida Action emailed three of the FTC's attorneys in the

26   Florida Action and the Receiver's counsel notifying them that the Debtor had filed for bankruptcy

27   protection. A copy of that email is attached hereto as Exhibit A. That email also attached pdf

28   copies of most the pleadings that the Debtor had filed in its bankruptcy case, including complete

1   copies of the Debtor's "Emergency Motion For Use Of Cash Collateral And Granting Replacement

2   Liens" (the "Cash Collateral Motion") and the Debtor's "Emergency Motion For Order

3   Authorizing Use Of Existing Cash Management System And Bank Accounts" (the "Cash

4   Management Motion").

5        16.    That same morning, the morning of Monday, September 17, 2007, I and my partner

6   Jeffrey Rehfeld telephoned the Receiver's counsel Mr. Schneider and spoke to Mr. Schneider. I

7   stated that the Debtor had filed for bankruptcy and understood that the Debtor's counsel in the

8   Florida Action had already emailed him most of the pleadings that the Debtor had filed in its

9   bankruptcy case. Mr. Schneider responded that he was aware of the Debtor's bankruptcy filing,

10  had received those pleadings, and in fact had already started to review them. Mr. Schneider

11  inquired about participating in the Debtor's bankruptcy process and I indicated that I believed a

12  Official Unsecured Creditors Committee would be appointed and that I thought that the Receiver

13  might serve as a valuable member of the Committee since he likely already had a good

14  understanding of the Debtor's business and circumstances from our prior discussions. I stated that

15  the Debtor continued believe that it made sense to keep the lines of communication open in the

16  hope of reaching an amicable resolution for the Receiver and the Debtor's bankruptcy estate.

17       17.    Immediately after our telephone discussion with the Receiver's counsel ended, Mr.

18  Rehfeld and I called Ms. Laura Kim, one of the FTC's lead counsel in the Florida Action and who

19  is also one of the FTC's lawyers who I met with during my prior meetings with the FTC in

20  Washington, D.C. I left Ms. Kim a voicemail stating that the Debtor had filed for bankruptcy

21  protection and requesting that if she would like to discuss the Debtor's bankruptcy filing she

22  should either call me back or call Mr. Rehfeld. I was out of the office Monday, September 17,

23  2007 and Tuesday, September 18, 2007, but did not receive a voicemail message from Ms. Kim

24  nor have I received a call from her since I returned to the office. Mr. Rehfeld has informed me

25  that he is not aware of having received a call or a voicemail from Ms. Kim.

26       18.    Later that afternoon, once the Bankruptcy Court had set a hearing for Thursday,

27  September 20, 2007 on the Debtor's Cash Collateral Motion and the Cash Management Motion,

28  the Debtor prepared a Notice of that hearing date and time on those motions. In an email sent later

-5-

1   that same afternoon Monday, September 17, 2007, the Debtor forwarded a pdf copy of that Notice

2   along with additional pdf copies of the pleadings that the Debtor had previously filed in its

3   bankruptcy case (including additional copies of the Cash Collateral Motion and the Cash

4   Management Motion to Ms. Kim of the FTC, as well as three other attorneys at the FTC involved

5   in the Florida Action, as well as the Receiver's counsel Mr. Schneider.

6        19.    On Monday, September 17, 2007, the Debtor also had copies of many of its

7   bankruptcy pleadings, including the Cash Collateral Motion, the Cash Management Motion, and

8   the Notice of the hearing of those pleadings sent by Federal Express to Ms. Kim as well as two

9   other FTC attorneys involved in the Florida Action.  Also served with those pleadings by Federal

10  Express was the Receiver and his counsel Mr. Schneider.  Attached hereto as Exhibit C is the

11  certificate of service indicating those pleadings were served on the foregoing individuals by

12  Federal Express.

13       20.    In preparation for the November 21, 2006 meeting with the FTC, I started with my

14  client to prepare a liquidation analysis for my client.  Although the liquidation analysis was not

15  finished by the time of the first meeting with the FTC, it was completed in December, 2006, and

16  was sent to the FTC's counsel at that time.  In order to prepare a liquidation analysis, I needed to

17  determine the names of anyone who had a security interest in the accounts receivable of the

18  Debtor or other assets of the Debtor.  I ordered and reviewed a UCC Search in October of 2006.

19  That search indicated that only the parties whose names are included in the Cash Collateral

20  Motion claimed a possible interest in the accounts receivable or cash collateral of the Debtor.  I

21  have also checked with the Debtor and determined that all of the bank accounts of the Debtor are

22  in the Debtor's name.  The Debtor has told me that there are no Control Agreements giving any

23  third party an interest in their bank accounts or cash.  Therefore, I concluded then and now, that

24  the Receiver of Network One and Access One does not have any interest in the cash of the Debtor

25  or in its accounts receivable.

26       21.    Since the Debtor's bankruptcy filing both the Receiver and certain other customers

27  have claimed by emails or phone calls that they have an interest in the accounts receivable and

28  cash.  However, neither the Receiver or these other customers have UCC-1 financing statements

1   filed as of the Debtor's bankruptcy filing, and no parties have Control Agreements with the Debtor

2   giving them a right in the Debtor's cash.

3        22.    On Friday, September 14, I learned that the adverse order was rendered in the

4   Florida Action that required a payment of the substantial sums by the Debtor. At that time I had

5   one of my partners, Mr. Rehfeld, order a further UCC 1 search. It is attached as Exhibit D. It

6   confirms that there are no UCC-1's filed by any parties other than the parties we had identified in

7   October of 2006. These are those parties named in the Cash Collateral Motion. We also

8   reconfirmed with our client that as of this date all of its cash accounts are in its name, and that no

9   Control Agreements have been signed giving any third party an interest in its accounts.

10       23.    On September 17, 2007, the Debtor filed in the Florida Action a Notice of

11   Bankruptcy. On September 20, 2007, the judge in the Florida Action, United States District

12   Judge, the Hon. Kenneth L. Ryskamp, issued an "Order Staying Proceedings against Defendant

13   The Billing Resource, D/B/A Integretel" and a copy of that order is attached hereto as Exhibit E.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:FJR:400436995.5

24.    The Debtor's Emergency Cash Collateral Motion only seeks an Interim Order authorizing use of Cash Collateral. When an official creditors committee (the "Committee") is appointed, my firm intends to meet with the Committee and address the issues relating to the final use of cash collateral. If the Debtor is not allowed to use such cash collateral pending a Final Hearing, the only alternative will be a Chapter 7 liquidation. A Chapter 7 bankruptcy liquidation will undoubtedly will not be the desire of the majority of the Debtor's customers. Accounts have been delivered by customers to the Debtor for processing. If the Debtor discontinues business now the Debtor's customers will only be further damaged as havoc would be created. When a Committee is formed, the Debtor is confident that such a Committee will support the continued use of cash collateral at a Final Hearing. But, if the Interim Motion is not granted, a Committee will not be formed to review the Final Motion, as the only alternative will be a Chapter 7. The Debtor should be given the opportunity to meet with an official Committee and negotiate a Plan of Reorganization that will benefit all parties in interest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 20, 2007, at San Francisco, California.

_____ /s/ Michael H. Ahrens
                    MICHAEL H. AHRENS

W02-WEST:FJR\400436995.5

DECLARATION

# Exhibit 3

1  HOWARD KOLLITZ (State Bar No. 059611)
   WALTER K. OETZELL (State Bar No. 109769)
2  STEVEN J. SCHWARTZ (State Bar No. 200586)
   DANNING, GILL, DIAMOND & KOLLITZ, LLP
3  2029 Century Park East, Third Floor
   Los Angeles, California 90067-2904
4  Telephone: (310) 277-0077
   Facsimile: (310) 277-5735
5  Email:  sschwartz@dgdk.com

6  JEFFREY C. SCHNEIDER
   TEW CARDENAS LLP
7  Four Seasons Tower, Fifteenth Floor
   1441 Brickell Avenue
8  Miami, Florida 33131-3407
   Telephone: (305) 539-2481
9  Facsimile:  (305) 536-1116

10 Co-Counsel for Creditor David R. Chase, Federal Receiver
   of Access One Communications, Inc., and Network One
11 Services, Inc.

## UNITED STATES BANKRUPTCY COURT

12

## NORTHERN DISTRICT OF CALIFORNIA

13

## SAN JOSE DIVISION

14
   | | |
   |---|---|
   | In re | ) Case No. 07-52890-ASW |
   | | ) |
   | THE BILLING RESOURCE, dba Integretal, a | ) Chapter 11 |
   | California corporation, | ) |
   | | ) **OPPOSITION OF FEDERAL** |
   | | ) **RECEIVER TO: (1) EMERGENCY** |
   | [Taxpayer's Identification No. 33-0289863] | ) **MOTION FOR USE OF CASH** |
   | | ) **COLLATERAL AND GRANTING** |
   | | ) **REPLACEMENT LIENS; (2)** |
   | | ) **EMERGENCY MOTION FOR ORDER** |
   | | ) **AUTHORIZING USE OF EXISTING** |
   | | ) **BANK ACCOUNTS AND CASH** |
   | Debtor. | ) **MANAGEMENT SYSTEMS; AND (3) EX** |
   | | ) **PARTE APPLICATION FOR ORDER** |
   | | ) **APPROVING KEN DAWSON AS** |
   | | ) **DEBTOR'S DESIGNATED** |
   | | ) **RESPONSIBLE INDIVIDUAL;** |
   | | ) **MEMORANDUM OF POINTS AND** |
   | | ) **AUTHORITIES** |
   | | ) |
   | | ) **[Declaration of David R. Chase, Federal** |
   | | ) **Receiver filed as a separate document** |
   | | ) **concurrently herewith]** |
   | | ) |
   | | ) Date:   September 21, 2007 |
   | | ) Time:   1:30 p.m. |
   | | ) Ctrm:   3020 |

-1-

314289.02 [XP]     23086

1   **TO THE HONORABLE ARTHUR S. WEISSBRODT, UNITED STATES**

2   **BANKRUPTCY JUDGE:**

3       **PLEASE TAKE NOTICE** that creditor David R. Chase, the United States District Court-

4   Appointed Receiver (the "Federal Receiver") of Access One Communications, Inc. ("Access One"),

5   and Network One Services, Inc. ("Network One") (collectively, the "Receiverships"), submits

6   herewith his Opposition to the Motions of The Billing Resource, dba Integretal, a California

7   corporation (the "Debtor") (1) For Use of Cash Collateral and Granting Replacement Liens (the

8   "Cash Collateral Motion"); (2) For an Order Authorizing Use of Existing Bank Accounts and Cash

9   Management Systems (the "Motion for Use") and the (3) Ex Parte Application For Order

10  Approving Ken Dawson as Debtor's Designated Responsible Individual (the "Application' ), filed

11  and served in this matter on or about September 17, 2007 (collectively, the "Motions"). The

12  grounds for such opposition are as described below.

13                                 **I.**

14                          **INTRODUCTION**

15      This filing and "Emergency" Cash Collateral Motion is a transparent and outrageous

16  attempt to use this Court to negate at least two orders entered by the United States District Court

17  for the Southern District of Florida in respect of an action by the Federal Trade Commission (the

18  "FTC") against the Debtor and others for defrauding consumers.  The first of these orders required

19  Debtor to disclose the existence of and turn over to a Federal Receiver, David R. Chase,

20  $1,762,762.56 in receivership assets (the Receivership Funds").  The second entered last Thursday,

21  September 13, 2007 (the "Omnibus Order"), required the Debtor to appear and show cause why it

22  should not be held in contempt of court for failing to do so.  Because of the latter order, the Debtor

23  filed its Petition herein on Monday, September 17, 2007.

24      However, the Debtor went further in his scheme than simply filing its Petition. It crafted

25  and filed the subject "Emergency" Cash Collateral Motion, the purpose and the effect of which is

26  to deceive this Court into frustrating the District Court's Order and give permission to the Debtor to

27  spend that money. As this Court will see, if the Debtor is allowed to consummate this scheme, the

28

                                 -2-

314289.02 [XP]      23086

1   Receivership Funds, which constitute redress [restitution] of consumers, will be rapidly dissipated

2   rendering the District Court's orders ineffective and destroying a remedy to defrauded consumers.

3        This scheme becomes clear when the Debtor's actions and the Cash Collateral Motion are

4   examined. Initially, it is clear that the Omnibus Order triggered the filing here, and the Debtor

5   admits this. However, the Debtor does not get around to discussing this until eight pages into the

6   Cash Collateral Motion, and when it does, its discussion and its statements misstate the terms and

7   import of the orders. The Debtor never attaches the September 13 Order as an Exhibit. If it had, the

8   Court would see this is more than a simple "Payment Order" as Debtor describes it. Instead, it

9   orders the Debtor to show cause why it should not be held in contempt of court for failing to pay

10  over the funds to the Federal Receiver, something that had long since been required. The Court

11  would see that the Debtor will not "ultimately prevail in the Florida Action." In fact, the District

12  Court, in addition to requiring the turnover of the Receivership Funds has held that neither

13  indemnification nor contractual claims allow the Debtor to retain them. The Court would see that

14  the District Court is exercising its in rem jurisdiction over the funds, inter alia, as an ancillary relief

15  measure in an action by a Federal agency. Finally, the Court would see that the District Court has

16  held the procedure it has employed is proper and there is no further need for separate proceedings,

17  and that this in rem jurisdiction and procedure is proper against Debtor to provide an ancillary

18  redress for defrauded consumers, where the Debtor's conduct may imperil the District Court's

19  ability to render effective judgment.

20        The "Emergency" Cash Collateral Motion here is designed to frustrate the District Court's

21  ability to render an effective judgment. It is clear from the proposed budget that the Debtor will

22  spend almost 40% of these funds in the next three weeks. No where in the Cash Collateral Motion

23  is there any attempt at adequately protecting the Federal Receiver's interests in the funds. Finally,

24  the "Emergency" nature of this Motion and its treatment as a "First Day Order" is obviously

25  designed to catch the Federal Receiver unaware. However, it did not.

26        This Court is respectfully requested to deny the Cash Collateral Motion before it and to

27  order the Debtor to comply with the District Court's Order or require the Debtor to segregate and

28  account for the funds.

314289.02 [XP]    23086

## II.

## FACTS

The history of the Federal Receivership and the September 14, 2007 District Court Order are set forth in detail in the Declaration of David R. Chase (the "Receiver's Declaration") filed herewith. To summarize, the FTC filed the United States District Court for the Southern District of Florida in the case entitled Federal Trade Commission v. Nationwide Connections, Inc., et. al., Case no. 06-80180-CIV-RYSKAMP/VITUNAC (the "District Court Action") against numerous entities including Access One and Network One, claiming that they were running a fraudulent billing scheme that generated more than $25 million in bogus call charges in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 53(b). David R. Chase was appointed by the District Court on the FTC's motion as receiver for Access One and Network One, among others. The Debtor was added as a defendant to the District Court Action on or about September 14, 2006.

On February 27, 2006, the District Court issued a Temporary Restraining Order and Order to Show Cause,[1] which required any business entity served therewith to provide to the FTC a sworn statement identifying each account or asset held in the name of or on behalf of, or for the benefit of a Defendant, and the balance or description of the nature and value of each such asset.[2] On March 6, 2006, in response to the TRO, the Debtor wrote a misleading letter to the FTC (which letter was not a "sworn statement") that "no amounts are currently due and owing" to the Receiverships. This statement was a lie. In fact, the Debtor was holding over $1.35 million in reserves that belonged to the Receiverships. The Receiver learned of this fact on October 11, 2006 and on October 16, 2006, filed a revised motion for an Order to Show Cause why the Debtor should not be held in contempt of court for violating the TRO and failing to disclose the reserves, among other things (the "Contempt Motion").[3] The Debtor countered with several motions, including a motion to modify

---

[1] A copy of the TRO is attached to the Receiver's Declaration, marked as Exhibit "B" and incorporated herein by this reference.

[2] See TRO at Section VI(C)(1)

[3] See, Exhibit "F" to the Receiver's Declaration

-4-

1   prior injunctive orders, a motion to stay contract claims, as well as a pending appeal to the 11th

2   Circuit Court of Appeals.[4]

3       Last Thursday, on September 13, 2007, the District Court Judge issued the Omnibus Order

4   granting the Contempt Motion, denying the Debtor's motions, and ordering the Debtor to transfer

5   the reserve funds to the Receiver, and ordering the Debtor to show cause, within 10 days, why it

6   should not be held in contempt for "failure to turn over the reserves." The Omnibus Order

7   recognized that "[t]he Receiver is seeking to recover the reserve funds pursuant to the Court's in

8   rem jurisdiction over receivership property, as memorialized in the TRO and the Amended

9   Preliminary Injunction."[5]

10       On Monday, September 17, 2007, the Debtor filed the herein bankruptcy case.

11                                                **III.**

12                                     **ARGUMENT**

13   **A.**     **The Filing of an "Emergency" Cash Collateral Order and Motion Was a Scheme to**

14   **Render Orders of the District Court Ineffective.**

15       The instant "emergency" cash collateral motion is a transparent attempt to render

16   ineffective at least two orders of the U.S. District Court for the Southern District of Florida in

17   respect of the Receivership Funds. As set forth in the Declaration of David R. Chase, the Federal

18   Receiver (the "Chase Declaration"), in 2006, the FTC instituted an action against several telecom

19   companies for fraudulent liability of consumers (the "FTC Action") and Mr. Chase was appointed

20   Receiver (Chase Declaration, paras. 4 and 5). Debtor was joined as a defendant (Chase

21   Declaration, para. 7).

22       The District Court issued several orders in the FTC Action which, inter alia, required

23   Debtor to identify and turn over funds which it was holding for the benefit of the Federal Receiver

24   (Chase Declaration, paras. 3, 5 to 15).

25

26   [4] See, Exhibits "G" through "I" to the Receiver's Declaration.

27   [5] See, Exhibit "A" at p. 4.

28

314289.02 [XP]    23086

1    Finally, on Friday September 14, 2007, after the Debtor's failure to comply, the District
2    Court entered an '"Omnibus Order" discussing the action and previous orders, requiring the Debtor
3    to show cause if it did not turn over the Receivership Funds, and making it clear that the Debtor
4    would not prevail in the FTC action in respect of the Receivership Funds. (Chase Declaration,
5    paras. 3, 11-16, and Exhibit " A"). On Monday, September 17, 2007, the Debtor filed its Petition
6    and the "Emergency" Cash Collateral Motion herein.

7    It is clear that this "emergency" motion is designed to render the District Court's orders
8    ineffective. Initially, the Debtor fails to disclose to this Court the true nature of the Omnibus
9    Order. Although Debtor makes reference to the order, it does not discuss its terms nor attach a
10   copy. Instead, it brushes it off as a "Payment Order" and makes the incredible assertion that it will
11   ultimately prevail. The most cursory review of the Omnibus Order (Exhibit "A") demonstrates
12   how incorrect this description and assertions are. Payment had long since been required and the
13   Court rejected each of Debtor's arguments.

14   The order was also clear that there is no issue as to the ownership of the $1,762,762.56.
15   Those funds are not property of the Bankruptcy Estate of the Debtor; rather, the Debtor has been
16   ordered to immediately transfer those funds to the Federal Receivership Estate. The District Court
17   recognized the propriety of the proceedings. Finally it found that its exercise of in rem jurisdiction
18   and the procedures were proper to insure a remedy for defrauded consumers.

19   The "Emergency" Cash Collateral Motion renders the orders ineffective. The budget
20   attached calls for nearly 40% of the Receivership Funds to be spent in the next three weeks. It
21   offers no adequate protection at all for the use of these funds. Finally, it is difficult to see why this
22   motion should be heard as an "emergency" if it were not to catch the Federal Receiver unaware.

23   **B.    The Receiver is not Adequately Protected.**

24   Section 363(e) of the Bankruptcy Code provides that, at any time, on request of an entity
25   with an interest in property which is proposed to be used, the court, with or without a hearing, shall
26   prohibit or condition such use, as is necessary to provide adequate protection.

27   The requirement of adequate protection is mandatory. In re Heatron, Inc., 6 B.R. 493
28   (Bankr. W.D. Mo. 1980); Lyons v. Fed. Savs. Bank (In re Lyons), 193 B.R. 637 (Bankr. D. Mass.

-6-

1   1996). Adequate protection, by its nature, must be determined on a case-by-case basis. In re

2   Martin, 761 F.2d 472 (8th Cir. 1985), In re Belco, Inc., 38 B.R. 525, 527 (Bankr. W.D. Okla.

3   1984). This inquiry as to adequate protection is limited to the interest of the creditor in the

4   property involved. First Bank of Miller v. Wieseler, 45 B.R. 871, 875 (D. S.D. 1985).

5        Adequate protection means that the interests of the secured creditor are adequately

6   protected by such use or other collateral is provided to secure any diminution and loss by such use.

7   A preliminary step in determining whether adequate protection is afforded the secured creditor for

8   the use of cash collateral is to conduct a valuation of the cash collateral. See In re George Ruggiere

9   Chrysler - Plymouth, Inc., 727 F.2d 1017, 1020 (11th Cir. 1984). Typically, this valuation is to be

10  made as at the date of the filing of the Debtor's chapter 11 petition. Id.

11       In the case of In re Bear River Orchards, 56 B.R. 976, 978 (Bankr. E.D. Cal. 1986) the court

12  described the analysis that should be made in determining whether the debtor-in-possession is

13  entitled to use cash collateral, as follows:

14            In any given case, the bankruptcy court must necessarily (1) establish the value of

15       the secured creditor's interests, (2) identify the risk to the secured creditor's value resulting

16       from the debtor's request for use of cash collateral; and (3) determine whether the debtor's

17       adequate protection proposal protects value as nearly as possible against risk to that value

18       consistent with the concept of indubitable equivalence.

19       Additionally, the Debtor in Possession is obligated to segregate and account for any cash

20  collateral in its possession, custody or control.  11 U.S.C. § 363(c)(4).

21       As evidenced by the District Court's rulings, at least $1,762,762.56 of the $1,945,598 that

22  the Debtor intends to use as cash collateral is not cash collateral at all, as it is property of the

23  Federal Receivership Estate and must be returned to the Federal Receiver forthwith. Nevertheless,

24  the Debtor does not even attempt to offer the Federal Receiver adequate protection in the form of

25  replacement liens, or otherwise, since it knows that the only form of adequate protection that would

26  be the indubitable equivalent of the Federal Receiver's interest in cash in the hands of the Federal

27  Receiver in the amount of $1,762,762.56, which is precisely what the District Court determined in

28  its Omnibus Order.

-7-

1    Moreover, the Debtor offers no evidence of the value or collectible nature of the accounts

2  receivable that the Debtor proposes to offer as adequate protection in the form of replacement liens.

3  The only "evidence" presented, other than self-serving, conclusory statements of Ken Dawson, is a

4  "Preliminary and Unaudited" Balance Sheet which shows total accounts receivable of

5  approximately $26 million.  See, Exhibit "B" to the Cash Collateral Motion.  Dawson "believes"

6  that $13.8 million in LEC Accounts Receivable should be collectible "on a rolling basis over the

7  next ninety (90) days."  Dawson Declaration at para. 25.  Dawson does not offer any projections,

8  forecasts or historical evidence to support this belief, other than his own assertion.  If it is in fact

9  true that $13.8 million will be collected "on a rolling basis" over the next 90 days, then there is no

10  need for the Debtor to use the Receivership Funds which were ordered to be delivered to the

11  Federal Receiver to operate its business.  The Debtor should be able to find post-petition financing

12  to continue to operate in the near term.  Of course, any lender would require more evidence of the

13  value and collectibility of those accounts than was furnished to the Court in support of the Cash

14  Collateral Motion.

15    The Federal Receiver requests "adequate protection."  The Federal Receiver hereby requests

16  this Bankruptcy Court to direct the Debtor to comply with the Omnibus Order of the District Court

17  and turn over the $1,762,762.56 to the Federal Receiver.

18  **C.    Immediate Relief from the Automatic Stay is the Only Remedy to Protect the**

19  **Diminution of the Receivership Property.**

20    Section 363(p) expressly provides that the trustee (or debtor in possession) has the burden

21  of proof on the issue of adequate protection but that the entity asserting an interest in the property

22  has the burden of proof on the issue of the validity, priority and extent of such interest.  11 U.S.C.

23  363(p).

24    When a creditor seeks relief under section 362 of the Bankruptcy Code, it is entitled to

25  protection against all of the risks of the trustee's continued possession of the collateral.  Alan N.

26  Resnick and Henry J. Sommer, Collier on Bankruptcy, ¶ 363.05[1]  (15th Ed. Rev. 2007).  This

27  encompasses any decline in market value that occurs during the delay as well as any depreciation

28  that results from the continued use of the collateral.  See, e.g., In re Continental Airlines, Inc., 154

-8-

1  B.R. 176 (Bankr. D. Del. 1993), *appeal dismissed as moot*, 91 F. 3d 553 (3rd Cir. 1996); In re Best

2  Products Co., Inc., 138 B.R. 155 (Bankr. S.D.N.Y. 1992).

3       This Bankruptcy Case follows a pattern of deceit on the part of this Debtor. The Debtor,

4  through its president Ken Dawson, lied to the Receiver, the FTC and the District Court as to the

5  existence of money in reserves held for the benefit of the Receiverships. Now, the Debtor is asking

6  this Court to approve the use of not less than $615,000 of cash held by the estate, in order to

7  continue its business operations, with Mr. Dawson at the helm. The Debtor does so without so

8  much as an offer of adequate protection to the Federal Receiver or a segregation or accounting of

9  the cash sought to be used, or evidence that the Federal Receiver (or any other secured creditor, for

10  that matter) is adequately protected. The Debtor's is unable to satisfy its burden of proof regarding

11  adequate protection.

12       By contrast, the Federal Receiver has already satisfied his burden of proof regarding his

13  interest in the property sought to be used as cash collateral. Accordingly, the only rights that the

14  Debtor might have with regard to the Federal Receiver's property must be asserted in the District

15  Court and/or the 11th Circuit Court of Appeals. For this Court to compel the parties to re-litigate

16  their disputes in this Bankruptcy Case would be a waste of judicial resources and would be contrary

17  to the principles underlying the doctrine of Collateral Estoppel. MCA Records, Inc. v. Charly

18  Records, Ltd. 865 F.Supp. 649. 654 (C.D.Cal.,1994) ("[I]n deciding whether to apply collateral

19  estoppel, the court must balance the rights of the party to be estopped against the need for applying

20  collateral estoppel in the particular case, in order to promote judicial economy by minimizing

21  repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial

22  system, or to protect against vexatious litigation"); Montana v. United States, 440 U.S. 147, 153, 99

23  S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

24  **IV.**

25  **CONCLUSION**

26       For the foregoing reasons, the Debtor's Motions, and each of them, should be denied. The

27  Federal Receiver believes that the appropriate remedy is relief from the automatic stay in order to

28  effectuate the orders of the District Court with respect to property of the Receiverships, which

-9-

314289.02 [XP]     23086

1   motion the Federal Receiver intends to file forthwith, should the Court not *sua sponte* order such

2   relief.  The Federal Receiver also respectfully requests that this Court order the Debtor to comply

3   with the Omnibus Order of the District Court and immediately turn over the $1,762,762.56 to the

4   Federal Receiver.  The Federal Receiver further requests all other appropriate relief in the premises.

5

6   Dated:  September 19, 2007                DANNING, GILL, DIAMOND & KOLLITZ, LLP

7

8                                            By: _____

9                                               STEVEN J. SCHWARTZ
                                                Attorneys for David R. Chase, Court-
10                                              Appointed Receiver of Access One
                                                Communications, Inc., and Network One
11                                              Services, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-10-

314289.02 [XP]     23086

# Exhibit 4

## Neal Goldfarb

| | |
|---|---|
| **From:** | Kim, Laura [LKIM@ftc.gov] |
| **Sent:** | Thursday, September 20, 2007 9:49 AM |
| **To:** | markdjohnsonpa@bellsouth.net; agberg@kslaw.com; kdinan@kslaw.com; ctapie@kslaw.com; jthomas@kslaw.com; jpollack@kslaw.com; JCS@tewlaw.com; maustin@mwe.com; ssiff@mwe.com; drodgers@lawdcm.com; michael.woodbury@woodbury-santiago.com; chad@schuylaw.com; tlong@barnettbolt.com; hwanders@barnettbolt.com; Richard Gordin; Steve Lancellotta; Neal Goldfarb; Max Maccoby; marty.alexander@hklaw.com; scott.newman@hklaw.com; Rosanne@macalusolaw.com; peter@macalusolaw.com |
| **Cc:** | Guerard, Collot; Schoshinski, Robert; McKewen, Richard; Mora, Michael |
| **Subject:** | FTC v. Nationwide, emergency motion |
| **Attachments:** | FTC Emergency Motion for Clarification.pdf; SCAN1590_000.pdf; Exhibit 1.pdf; Exhibit 2.pdf |

Counsel:  I am attaching a copy of the FTC's Emergency Motion for Clarification that the Automatic Stay Does Not Apply to the FTC's Law Enforcement Action and the Ongoing Contempt Proceeding and Supporting Memorandum of Law, with exhibits and emergency certification.  I expect that this Motion will be filed soon in hard copy.  I called chambers to let them know that I would shortly be filing an emergency motion, and I am simultaneously faxing a copy of the motion to Judge Ryskamp's chambers, per Kari's suggestion.

<<FTC Emergency Motion for Clarification.pdf>> <<SCAN1590_000.pdf>> <<Exhibit 1.pdf>> <<Exhibit 2.pdf>>

_____

Laura Kim
Attorney, Division of Marketing Practices
Federal Trade Commission
600 Pennsylvania Avenue, NW Room H-288
Washington, DC 20580
t.202.326.3734
f.202.326.3395