UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-80180-Civ-Ryskamp/Vitunac

FEDERAL TRADE COMMISSION,

      Plaintiff,

vs.

NATIONWIDE CONNECTIONS, INC., *et al.*,

      Defendants.

_____/



FILED by _____ D.C.

APR 1 4 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Order of Reference (DE 825) from United States District Judge Kenneth L. Ryskamp "for a hearing and for issuance of a Report and Recommendation on . . . the Final Application for Receiver and His Professionals for Allowance of Compensation and Reimbursement of Expenses, filed November 11, 2008 [DE 823]" ("Final Fee Application"). No party has filed responses or otherwise opposed the Final Fee Application. The FTC states that it has no objection to the fees sought in the Final Fee Application. The District Court expressly stated that a hearing was necessary "to determine the reasonableness of the requested fees . . . because no other safeguard to ensure the reasonableness of said fees is available." This Court held a hearing on March 19, 2009. This matter is now ripe for review.

## PROCEDURAL BACKGROUND

On February 27, 2006, the Federal Trade Commission ("FTC") filed an *ex parte* complaint (DE 3) seeking entry of an injunction, alleging that Defendants conducted a massive fraudulent billing scheme ("cramming") that generated approximately $30 million dollars in bogus collect call

1

charges from millions of consumers.[1] That same day, this Court entered a Temporary Restraining Order ("TRO") (DE 18), which appointed David R. Chase ("Receiver") to serve as Receiver on a temporary basis to marshal the corporate Defendants' assets for the benefit of the victimized consumers. On March 8, 2006, the TRO was replaced by a Preliminary Injunction Order (DE 29), which appointed the Receiver on a permanent basis and expanded the receivership to include the remaining corporate receivership entities.

The Receiver thereafter engaged the law firm of Tew Cardenas LLP to serve as its counsel. The Receiver also retained the services of the accounting firm of Kapila & Company. On September 26, 2006, the Court entered an Amended Preliminary Injunction Order (DE 223), and the receivership was further expanded to include the assets of individual Defendants Willoughby and Mary Lou Farr. The FTC has also since amended its complaint (DE 255) to include as additional "aggregator" defendants, The Billing Resource d/b/a/ Integretel ("Integretel") and BSG Clearing Solutions North America, LLC and affiliated BSG entities ("BSG"), both with which certain of the receivership entities did business. The pending Final Fee Application seeks final payment for the services and expenses of the Receiver and his professionals, Tew Cardenas and Kapila & Co.[2]

---

[1] As stated in the Receiver's Final Report (DE 805-2), although approximately $30 million was taken from consumers as a result of the "cramming" fraud, forensic accountants concluded that the receivership entities received $19.6 million because billing aggregators and local telephone companies received percentages of the total amounts billed to consumers.

[2] The Final Fee Application does not include the fees requested by the Los Angeles-based law firm of Danning, Gill, Diamond & Kollitz, LLP ("Danning"). In September 2007, the Receiver hired Danning as special bankruptcy counsel after aggregator Defendant Integretel initiated bankruptcy proceedings, which included claims against FTC and the Receiver. Danning has filed a separate fee application (DE 822), which this Court will address in a separate Report and Recommendation.

2

## THE RECEIVER AND HIS PROFESSIONALS' PRIOR THREE FEE APPLICATIONS

The Receiver and his professionals filed three prior fee applications in this case. The District Court awarded all fees and costs requested in the first and third fee applications (DE 150, 775). As to the second application, which was referred to the undersigned, the District Court adopted the Report and Recommendation recommending that the requested fees be reduced by 25% (DE 450). The following is a summary of all fees previously awarded by the Court to the Receiver and his professionals in this case:

> First Fees Award:
> (2 ½ month billing period from February 27, 2006 to May 10, 2006)
> Receiver......................................................................$147,367.06
> Receiver's Counsel (Tew Cardenas)........................... $114,356.16
> Forensic Accountants (Kapila & Co.)..........................$102,457.43

> Second Fees Award:
> (3 ½ month billing period from May 11, 2006 to August 31, 2006)
> Receiver ....................................................................$92,005.25
> Receiver's Counsel .................................................... $122,115.71
> Forensic Accountants.................................................$100,449.20

> Third Fees Award:
> (13 month billing period from September 1, 2006 to September 30, 2006)
> Receiver.......................................................................$82,132.19
> Receiver's Counsel......................................................$283,546.23
> Forensic Accountants....................................................$22,203.00

> Total Fees Received to Date:
> Receiver......................................................................$321,504.50
> Receiver's Counsel......................................................$520,018.10
> Forensic Accountants...................................................$225,109.63

During the relevant billing periods covered in the first three applications, the Receiver reported having secured millions of dollars in potential assets to the receivership estate. The Receiver indicated that much time was spent by him and his professionals liquidating those assets

to secure funds for the receivership estate. The Receiver summarized the material developments which took place during the prior three billing periods in three separate reports (DE 78, 320 and 771). By the time of the second fee application, the Receiver reported having collected well over $3 million dollars in funds and/or equivalent value for the estate. Specifically, early on in the case, the Receiver reported having acquired millions of dollars worth of real estate and other personal property (including vehicles, boats, jewelry, and expensive furnishings) that had been paid for with funds derived from the "cramming" fraud. With regard to the real estate, the Receiver successfully secured and negotiated the sale of multi-million dollar receivership properties resulting in net proceeds for the receivership estate. The Receiver also negotiated the sale of miscellaneous personal property items to secure additional funds. Additionally, the Receiver successfully shut down Defendants' operations, preserved evidence, and investigated potential means to efficiently return monies to the victimized consumers.

During the billing periods covered by the first three applications, the Receiver and his counsel successfully initiated contempt proceedings against the Farrs and Danny Trujillo, bringing $91,250 into the receivership estate. Additionally, during this timeframe, the Receiver reached a settlement with BHD related to the proceeds of two multi-million dollar properties.

THE RECEIVER AND HIS PROFESSIONALS' FINAL FEE APPLICATION

The Final Fee Application covers the thirteen month billing period from October 1, 2007 to October 31, 2008. The following is a summary of the final request for fees:

Final Fees Request:
Receiver....................................................................$62,175.00
Receiver's Counsel (Tew Cardenas).........................$117,701.73
Forensic Accountants (Kapila & Co.).........................$32,782.66

4

In total, the Final Fee Application requests $212,659.39 for a three hundred and ninety-seven (397) day period, which averages to fees of approximately $535.66 per day (including weekends). The Receiver reported having "a few tasks to conclude" before he can file a motion to close the receivership, but stated that he "is hopeful that he and his professionals will be able to perform those tasks free of charge."

The Receiver advised that the professional fees in this case tapered down drastically over the three year life of this case due to the front-loaded nature of a receivership case, such as this, with many assets. On August 11, 2008, the Receiver filed a Final Report (DE 805-2), which the District Court approved on August 18, 2008 (DE 808). In the Final Report, the Receiver stated that, since inception of the Receivership, approximately $4.8 million in funds had been recovered. The Final Report also stated that "[t]he FTC and the Receiver each have reached settlements or proposed settlements with all of the defendants." The Final Report recounts the steps taken by the Receiver to dissolve the receivership assets, including the sale of valuable real estate and personal property to generate proceeds for the receivership estate.

In the Final Report, the Receiver details the efforts undertaken to dissolve five remaining real estate properties, thousands of personal property items, and jewelry. The Receiver sold one of these real estate properties for $280,000, and expected the remaining four properties to be foreclosed. As to the miscellaneous personal property items, ranging from appliances to woven Persian carpets to camera equipment, the Receiver stated that these items were auctioned off, resulting in net proceeds for the estate amounting to $100,000. The jewelry sold for $46,000. The Receiver deposited all the net sale proceeds into a FTC fund. The Final Report also describes the status of the litigation involving the aggregator defendants. An accounting of the receivership estate's finances is set forth

in the Final Report, which states that, as of August 11, 2008, approximately $1.8 million remained in the receivership bank accounts. This amount is reached by calculating the approximately $4.8 million in funds generated by the Receiver less disbursements approximating $3 million for professional fees, prior transfers to the FTC, and settlements. The Final Report also lists additional actions needed to wind-down the receivership, including concluding the settlement documentation for the Integretel settlement, monitoring the remaining foreclosure proceedings, paying a court-approved "receivership claim," selling any remaining receivership assets, and transferring receivership records to FTC.

In the Final Fee Application, the Receiver reports that the settlement documentation for the proposed settlement with Integretel, described in the Final Report, has since been finalized and that the Receiver was awaiting a $650,000 cash settlement amount from Integretel to the receivership estate. The Receiver also states that all remaining receivership assets have been sold and the records in his possession transferred to a federal agency that has expressed interest in this case. The Receiver stated that he was in the process of monitoring three remaining foreclosure proceedings (the Arlington Property, the Lighthouse Drive Property, and Beattie Lane), but that he hoped to file a motion to close the receivership within 90 days.

The Final Fee Application contains summarized charts, organized by individual, of the final fees and expenses requested. Attached to the Final Fee Application are billing statements with summarized descriptions of the daily services rendered by the Receiver and his staff during the relevant billing period. The Receiver maintains that he "has very leanly staffed this case by predominantly using the services of Mr. Robert Carey, an attorney with a business background and substantial receivership and forensic accounting experience" and also by using administrative staff

6

to perform tasks at reduced rates. Also attached to the Final Fee Application are billing statements containing summarized descriptions of the legal services rendered by Tew Cardenas and the forensic accounting services rendered by Kapila & Co. The billing statements also list the out-of-pocket expenses incurred by Tew Cardenas and Kapila & Co.

MARCH 19, 2009 HEARING

The Court held a hearing on March 19, 2009 to allow the Receiver and his professionals a full opportunity to explain and justify the fees requested in their Final Fee Application. The Receiver (David Chase) and his associate (Robert Carey), the Receiver's counsel (Jeffrey Schneider of Tew Cardenas), the Receiver's accountants (Soneet Kapila and Carol Fox of Kapila & Co.), the Receiver's Special Bankruptcy Counsel (Howard Kollitz of Danning), and FTC's counsel (Collot Guerard) were present at the hearing.[3] No witnesses testified and the parties proceeded by argument and by response to the Court's inquiries.

Appearing on behalf of the FTC, Mrs. Guerard was complimentary of the services provided by the Receiver and his professionals. She advised the Court that FTC is prepared to recommend the Receiver and his professionals in future FTC cases. Mrs. Guerard described the Receiver and his counsel as "wonderful" and "aggressive," and indicated that they had exercised sound judgment in this case. She informed the Court that she reviewed the billing records submitted by the Receiver and his professionals on an item-by-item basis and finds the fee requests to be justified and reasonable. Mrs. Guerard stated that she was impressed by how much the Receiver and his

---

[3] The March 19, 2009 hearing addressed both the Final Fee Application filed by the Receiver and his professionals, and Danning's separate fee application. The parties' arguments pertaining to Danning's separate fee application will be discussed more fully in a separate Report and Recommendation to be issued by this Court regarding Danning's fee application.

7

professionals accomplished with the "little amount of money they requested." Mrs. Guerard believed the Receiver and his professionals remained mindful of the Court's expressed concerns with the fees being generated in this case and, in fact, billed at reduced and capped rates while also pushing tasks down to lower level employees as often as they could. Mrs. Guerard added that the Receiver and his counsel substantially lowered their hourly rates after negotiating such rates with FTC early on in the case.

At the hearing, the parties all discussed the evolution of the complex litigation involving aggregator Defendant Integretel. All the parties characterized Integretel as a difficult defendant who took unprecedented legal actions in other forums that challenged the authority of this Court. By way of background, Mrs. Guerard summarized the events involving the Integretel litigation and leading up to the instant billing period. Specifically, she described the contempt motion filed by the Receiver and his counsel against Integretel regarding funds that the Receiver claimed should be turned over pursuant to the TRO, which ultimately resulted in a contempt order issued by the District Court requiring Integretel to turn over approximately $1.7 million to the Receiver. Mrs. Guerard described the contempt order as good precedent for FTC and receiverships generally.

Mrs. Guerard explained that the instant billing period began shortly after the District Court's contempt order was issued, and before Integretel filed for bankruptcy in California. During this billing period and within a matter of days following the issuance of the contempt order, Integretel sued FTC and the Receiver in an adversarial bankruptcy proceeding in California. Ultimately, after months of litigation in four separate courts and settlement discussions, the parties reached a $650,000 settlement relating to the contempt matter. The Court asked and Mr. Kollitz confirmed that this $650,000 cash payment has been funded.

8

Mr. Schneider discussed the complications of the litigation involving Integretel. He argued that the Receiver's actions during the instant billing period accomplished two important objectives that the Court should consider in determining whether the requested fees are reasonable. First, while conceding that "in a purely economic sense," the total professional costs associated with litigating and settling the Integretel matter exceeds the $650,000 amount recovered, the Receiver believed he had an important "obligation to vindicate" the District Court's authority. Specifically, Mr. Schneider explained that Integretel filed motions in the California bankruptcy court on an "emergency" basis seeking to use cash collateral that the District Court had already ordered it to turn over to the receivership by way of the contempt order. Mr. Schneider added that Integretel failed to inform the bankruptcy court about the orders already issued by the District Court in this case, which prompted the need for swift action by the Receiver. Consequently, in order to protect the money belonging to the receivership and to preserve the integrity of this Court's rulings, the Receiver took immediate action to address the bankruptcy litigation and also filed reports in this case to keep the Court fully advised of the ongoing bankruptcy proceedings. The Receiver also made the decision to hire Danning as special bankruptcy counsel. Second, Mr. Schneider argued that the Receiver's actions, with the aid of his professionals, in the Integretel litigation contributed to accomplishing the important goal of getting Integretel, a "habitual, law violator," under control and, eventually, out of business.

The Court asked and Mr. Schneider confirmed that no other fee applications in this case are forthcoming from the Receiver and his professionals. In response to inquiries about the forensic accounting services rendered during the instant billing period, Mrs. Guerard stated that Kapila & Co. provided services aimed at helping wrap up the receivership, such as filing tax returns for the

receivership entities and transferring receivership funds to FTC. Additionally, the Court asked about unidentified expenses listed in Kapila & Co.'s billing statements with the description "Ana M. Salazar." Mr. Schneider explained that Ana Salazar is his secretary. Mr. Kapila explained that these entries represent federal express charges for correspondence sent from Kapila & Co. to Ana Salazar at Tew Cardenas.

In response to the Court's inquiry about refunding the fraud victims, Mrs. Guerard represented that it is unlikely that FTC will offer consumer redress in this case, not due to lack of money but due to logistical difficulties. Specifically, Mrs. Guerard indicated that because telephone numbers change over time, FTC is concerned about refunding money to telephone numbers belonging to new consumers who were not impacted by the fraudulent billing scheme. According to Mrs. Guerard, the money that has been recovered by the Receiver and his professionals in this case will go to the U.S. Treasury.

The Court asked Mr. Schneider about the status of the remaining foreclosure proceedings, inquiring as to which foreclosure proceedings, if any, were still outstanding. Mr. Schneider answered that, as of the date of the hearing, two foreclosure proceedings remained outstanding, the Beattie Lane and the Arlington properties in Vermont. Mr. Schneider stated that the chance of there being any excess after these foreclosure sales are "slim" but that the Receiver will continue to monitor the proceedings until they are concluded to ensure that any proceeds, if there are any, be submitted to the receivership. Short of these last two foreclosure proceedings, Mr. Schneider stated that all other tasks are complete. Therefore, the Receiver is prepared to move to close the receivership once these two foreclosures are completed.

At the close of the hearing, the Court instructed all the parties to submit supplemental filings. Such filings were to include additional documents and comments based on the Court's inquiries and authorities cited at the hearing.

POST-HEARING SUPPLEMENTAL FILINGS

The Receiver and FTC each filed a post-hearing supplement in support of the Final Fee Application. The Receiver's supplemental filing (DE 848) maintains that the out-of-pocket expenses requested in the Final Fee Application benefitted the receivership estate, were reasonable and necessary, and thus should be reimbursed. The Receiver also reiterated that work has consistently been pushed down to associates and staff, resulting in significant cost savings for the receivership estate, and that each lawyer and staff member made distinct contribution with no duplication of efforts. The Receiver stated that the time spent on settlement efforts is recoverable and that such efforts are "one of the most important functions of a Receiver." The Receiver added that the settlements reached with two aggregator Defendants resulted in an infusion of nearly $2 million into the receivership estate.

In response to the Court's inquiries at the hearing about the Receiver's fees in similar receivership cases, the Receiver stated that the hourly rates in the Final Fee Application are "considerably lower" than rates received in other similar cases. As support, the Receiver attached eleven orders issued over the last five years in receivership cases in the Southern and Middle Districts of Florida. The orders establish that courts have previously awarded hourly rates ranging from $275 to $385 for the legal services by Mr. Schneider of Tew Cardenas. The orders also show the total amounts awarded to other receivers during discrete billing periods, as well as the total amounts awarded for the legal services of Tew Cardenas and accounting services of Kapila & Co.

11

during those same periods. To address the Court's concerns about the hourly rates of Tew Cardenas paralegals, Tew Cardenas agreed to voluntarily cap its paralegal hourly rates at $125.00. Tew Cardenas agreed to also voluntarily reduce the hourly rate of one of its attorneys who spent minimal time on the case from $375.00 to $270.00. The Receiver emphasizes that during the five month period after the Final Fee Application was filed through the date of the supplemental filing, the Receiver and Tew Cardenas continued to work on final outstanding issues in this receivership free of charge. The Receiver concluded by noting that FTC reviewed the Final Fee Application before and after the hearing and continues to have no objection to the fees requested.

FTC also submitted a supplemental filing (DE 847). FTC states that it negotiated hourly billing rates with the Receiver and his counsel prior to recommending to the District Court that the Receiver be appointed in this case. According to FTC, the hourly billing rates, the number of hours billed, and the expenses incurred by the Receiver and his professionals, as set forth in the Final Fee Application, are reasonable and justified. FTC explained that, during the thirteen months covered in the Final Fee Application, the Receiver monitored legal proceedings in four different forums, oversaw the activities of his counsel and accountants, and supervised the administration and disposition of real estate and personal property under his control with the help of Tew Cardenas and Kapila & Co. FTC stated that it reviewed the time sheets of the Receiver and his professionals before and after the hearing and that it continues to support the Final Fee Application after finding no duplication of billed events or any other questionable billing items.

## DISCUSSION

The issue before the Court is whether the fees and expenses requested by the Receiver and his professionals are reasonable. The Receiver is an agent of the Court. As such, the Court intends

12

to ensure that the Receiver, his staff and his professionals, receive a fair and reasonable compensation for their services rendered and expenses incurred. At the same time, this is a court of equity, and the Court will endeavor to determine that all fee payments to the Receiver, his staff and his professionals, are fair and reasonable to all parties under the facts and circumstances that these services were rendered. It is long-standing tradition, as described by the Supreme Court, that:

> The receiver is an officer of the court, and subject to its directions and orders; and while, in the discharge of his official duties, he is at all times entitled to apply to the court for instruction and advice, he is also permitted to obtain counsel for himself, and counsel fees are considered as within the just allowances that may be made by the court. . . .

> So far as the allowances to counsel are concerned, it is a mere question as to their reasonableness. Nor is there any doubt of the power of courts of equity to fix the compensation of their own receivers. That power results necessarily from the relation which the receiver sustains to the court; and, in the absence of any legislation regulating the receiver's salary or compensation, the matter is left entirely to the determination of the court from which he derives his appointment. The compensation is usually determined according to the circumstances of the particular case, and corresponds with the degree of responsibility and business ability required in the management of the affairs intrusted to him, and the perplexity and difficulty involved in that management. Like all questions of costs in courts of equity, allowances of this kind are largely discretionary, and the action of the court below is treated as presumptively correct, 'since it has far better means of knowing what is just and reason able than an appellate court can have.'

Stuart v. Boulware, 133 U.S. 78, 81-82 (1890) (quoting Trustees v. Greenough, 105 U. S. 527, 537 1881). Thus, the Receiver and his professionals are entitled to reasonable compensation and out-of-pocket expenses for the performance of their duties under the order of appointment.

The law in this circuit for assessing the reasonableness of fees is set out in Norman v. Hous. Auth. of Montgomery, 836 F.2d 1292 (11th Cir.1988). According to Norman, the starting point in determining an objective estimate of the value of professional services is to calculate the "lodestar" amount, by multiplying a reasonable hourly rate by the number of hours reasonably expended. Id.

13

at 1299 (citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). A district court must elucidate the manner in which it determines a reasonable award of fees. Id. at 1304.

As part of its analysis, the Court considers the factors enunciated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974).[4] Johnson mandates twelve factors[5] that district courts should balance in awarding fees. Although this balancing test has since been displaced by the lodestar formula described above, the Eleventh Circuit approves of district courts considering the Johnson factors in establishing the lodestar amount. Norman, 836 F.2d at 1299.

I.    REASONABLE FEES

To determine a reasonable fee award, the Court must consider customary hourly fees charged in this community for similar services, as well as the number of hours expended on the case. Norman, 836 F.2d at 1299. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Norman, 836 F.2d at 1299 (citing Blum v. Stenson, 465 U.S. 886, 895-96 n. 11 (1984)).

Courts consider several factors in determining the prevailing market rate, including "the attorneys' customary fee, the skill required to perform the legal services, the attorneys' experience, reputation and ability, the time constraints involved, preclusion from other employment,

---

[4]  In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

[5]  The Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the legal questions involved; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Johnson, 488 F.2d at 717-19.

14

contingency, the undesirability of the case, the attorneys' relationship to the client, and awards in similar cases." Mallory v. Harkness, 923 F.Supp. 1546, 1555 (S.D. Fla.1996). The fee applicant bears the burden of producing "satisfactory evidence that the requested rate is in line with prevailing market rates." Norman, 836 F.2d at 1299. Generally, acceptable proof of the market rate may be comprised of testimony and direct evidence from other legal practitioners in the relevant legal community who are familiar with the type of legal service provided and the prevailing market rate for such work, however such proof must comprise "more than the affidavit of the attorney performing the work" and "necessarily must speak to rates actually billed and paid in similar lawsuits." Id.

After determining a reasonable hourly rate, the Court must next evaluate the requested fees for reasonableness in terms of total hours expended. In determining the reasonable number of hours expended, a court must exclude from the amount claimed any hours that are "excessive, redundant, or otherwise unnecessary." Norman, 836 F.2d at 1301. In other words, a fee applicant must exercise "billing judgment." Id. In exercising proper billing judgment, a party should have excluded those hours that would be unreasonable to bill a client without reference to skill, reputation or experience. Duckworth v. Whisenant, 97 F.3d 1393, 1397 (11th Cir. 1996) (citing Norman, 836 F.2d at 1301). Courts deduct unnecessary or redundant hours and time spent upon "discrete and unsuccessful claims" from the calculations. Id.

The Receiver and his professionals support the Final Fee Application by submitting itemized bills. According to these bills, the hourly rates of the Receiver and the professionals that worked on

15

his behalf range from $75 to $375.[6]  Though the Court initially had two areas of concern involving

the hourly rates of one Tew Cardenas attorney and two paraprofessionals, the Court expressed those

concerns at the hearing and Tew Cardenas has since agreed to reduce those hourly rates.

Specifically, one area of concern to the Court was the hourly rates of two Tew Cardenas

paraprofessionals, which the Court found to be in excess of the prevailing market rate.  As stated at

the hearing, the Court considers a paraprofessional rate of $125.00 per hour to be reasonable.  After

the hearing and to address this concern, Tew Cardenas agreed to cap its paraprofessional hourly rate

to $125.00.  Another area of concern the Court identified was the $375.00 hourly rate of Tew

Cardenas attorney B. Tague.  After the hearing, Tew Cardenas agreed to reduce Mr. Tague's rate to

$270.00.  Apart from these two areas of concern, which have since been addressed, the Court

concludes that the hourly rates sought by the Receiver and his professionals are in line with

prevailing market rates and are, thus, reasonable.  The Court reaches this conclusion after having

considered the experience of the Receiver and his professionals in their respective areas of expertise,

having reviewed recent court orders awarding professional fees in similar receivership cases, and

based on the Court's familiarity with awarding fees in general.

Turning next to the issue of reasonableness in terms of total hours expended, the Court

recognizes the complexities that arose during the final billing period, including the multi-forum

Integretel litigation, and the efforts required to wind-down the receivership by selling the remaining

assets, organizing and transferring records, finalizing settlements, and transferring all of the recovered

---

[6] The Final Fee Application includes an hourly rate of $375.00 for one Tew Cardenas attorney, but Tew Cardenas has since agreed to cap that attorney's rate at $270.00 (DE 848).  Additionally, Kapila & Co. professional hourly rates range from $80 to $480, however the blended hourly rate used to calculate the forensic accounting fees is $225.00.

funds to FTC.  During the final billing period, the Receiver and his professionals worked diligently and efficiently to wind-down the receivership by preparing for and monitoring real estate sales and foreclosure proceedings, as well as coordinating auction-related activities to sell valuable personal property items.  In addition, during this period, the Receiver and his professionals prepared for and participated in discussions that ultimately resulted in a settlement with Integretel, which benefitted the estate to the tune of $650,000.00.  The Court notes also that the Receiver's actions related to the Integretel litigation during this billing period preserved the integrity of the District Court's rulings in this case.  While such actions aimed at preserving the Court's integrity are not easily quantifiable in monetary terms, respect for the court is of paramount importance and this Court ascribes value to such preservation.  Further, the Court notes that the Receiver and his professionals will not seek any additional fees or expenses even though services have been provided during the five months following the filing of the Final Fee Application that are necessary to wind-down the receivership.  The Receiver and his counsel agree to continue monitoring two outstanding foreclosure proceedings and, once these proceedings have concluded, will move to close the receivership.

The Court has independently reviewed the billing records and carefully examined the summaries of time expended by the Receiver, Tew Cardenas, and Kapila & Co.  Based on this review, it is apparent to the Court that the Receiver and his professionals have exercised sound billing judgment during this final expense period and have demonstrated a mindfulness of the Court's expressed concern with the overall fees generated in this case.  For instance, the Court notices that the Receiver and his professionals effectively assigned tasks to varying levels of staff and charged rates to complete such tasks that are reasonably proportionate to the level of skill needed for the actual tasks.  Moreover, a review of all four fee applications in this case reveals that, consistent with the

17

Receiver's representations, the hours expended and expenses sought for services performed during the final billing period are considerably less than the hours expended and expenses sought during each of the prior three billing periods.

Subject to the reductions noted above, the Court finds the requests for fees submitted by or on behalf of the Receiver and his staff ($62,175.00 for 251.70 hours of work), Tew Cardenas ($111,139.50 (discounted amount) for 506.5 hours of legal work), and Kapila & Co. ($32,333.50 for 143.70 hours of forensic accounting work) to be reasonable and for services necessary in this case.

II.    REASONABLE EXPENSES

The Final Fee Application seeks to recover out-of-pocket expenses incurred by the Receiver's professionals in the total amount of $5,972.39. As support, the Receiver submitted itemized lists of expenses incurred. (DE 823-4, p.23 and DE 823-5, pp. 3, 13). The Receiver and his professionals are entitled to reasonable out-of-pocket expenses for the performance of their duties under the order of appointment when such expenses have benefitted the receivership estate. S.E.C. v. Elliott, 953 F.2d 1560, 1576-77 (11th Cir. 1992); S.E.C. v. Pension Fund of Am., 2008 WL 4999243, at *2-3 (S.D. Fla. Nov. 19, 2008). This Court finds that the costs and expenses totaling $5,972.39 incurred by the Receiver and his professionals for standard items such as Westlaw research, title search fees, postage, photocopies, telephone charges, delivery charges, and courier services benefitted the receivership estate, were reasonable and necessary, and thus, should be reimbursed.

### RECOMMENDATION TO THE DISTRICT COURT

Based on the foregoing, this Court respectfully RECOMMENDS that the District Court GRANT in part and DENY in part the Final Application for Receiver and His Professionals for Allowance of Compensation and Reimbursement of Expenses, filed November 11, 2008 (DE 823).

The Receiver should be allowed to disburse the following amounts from receivership funds:

(1)     The Receiver and his staff should be awarded $62,175.00 as compensation for services rendered during the time period covered in the Final Fee Application.

(2)     The Receiver's counsel, Tew Cardenas LLP, should be awarded $111,139.50[7] as compensation for legal services rendered during the time period covered in the Final Fee Application and $5,523.23 as reimbursement for expenses during that period.

(3)     The Receiver's accountants, Kapila & Company, should be awarded $32,333.50 as compensation for legal services rendered during the time period covered in the Final Fee Application and $449.16 as reimbursement for expenses during that period.

NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable United States District Judge Kenneth L. Ryskamp, within ten (10) days after being served with a copy. See 28 U.S.C. § 636(b)(1)(C). Failure to file timely objections may limit the scope of appellate review of factual findings contained herein. See United States v. Warren, 687 F.2d 347, 348 (11th Cir.1982) cert. denied, 460 U.S. 1087 (1983).

DONE and SUBMITTED in Chambers at West Palm Beach in the Southern District of Florida, this _14_ day of April, 2009.

ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

Copies to:
Honorable Kenneth L. Ryskamp
All counsel and parties of record

---

[7] This amount includes a reduction in legal fees for attorney B. Tague to $270.00 an hour, as well as a reduction in paraprofessional fees for Irma Spoto and Yohami Guerra to $125.00 an hour.